**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 18-532 |
| | ) | |
| v. | ) | Judge Cathy Bissoon (W.D. Pa.) |
| | ) | |
| 80,794 SQUARE FEET OF LAND, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |


## FINDINGS OF FACT, CONCLUSIONS OF LAW & ORDER

The sole remaining issue in this case is just compensation for the taking of three parcels of property previously owned by Defendant Reily Street Associates, Inc. ("RSA") in the city of Harrisburg, Pennsylvania. Stipulated Facts (Doc. 100), hereinafter "Stip. Fact," No. 1. The United States used its power of eminent domain to acquire the three parcels of property on April 9, 2018. Stip. Fact No. 3. The parties agree that just compensation is the market value of the Subject Properties as of April 9, 2018 (the "Date of Value" or "Date of Taking"). Stip. Fact Nos. 3-4. The parties further agree that market value is the amount in cash, or on terms reasonably equivalent to cash, for which in all probability the Subject Properties would have sold on the Date of Value, after a reasonable exposure time on the open competitive market, from a willing and reasonably knowledgeable seller to a willing and reasonably knowledgeable buyer, with neither acting under any compulsion to buy or sell, giving due consideration to all available economic uses of the property at the time of the effective date. Stip. Fact No. 5. Having

conducted a four-day Bench Trial[1] on February 22, 2021 through February 25, 2021 to determine the market value of the Subject Properties, the Court rules as follows.

## FINDINGS OF FACT

The Court makes the following findings of fact based upon the preponderance of the evidence presented at trial:

*The Three Properties ("Subject Properties") At Issue*

1. The Subject Properties consist of three separate parcels of land totaling 1.855 acres, or 80,794 square feet,[2] in the midtown neighborhood of Harrisburg, Pennsylvania. Stip. Fact Nos. 11 and 12; Schedules C, D and E of the Declaration of Taking (Doc. 2).

2. The Subject Properties had the following addresses, tax map parcel numbers, areas, and uses prior to the taking:

| Address | Tax Parcel | Area | Status Prior To Taking |
|---|---|---|---|
| 644 Boyd St. | 07-026-020 | 0.032 acres | Vacant Grassland |
| 634 Reily St. | 07-102-033 | 1.765 acres | Commercial Parking Lot |
| 1519 N. Sixth St. | 07-102-034 | 0.058 acres | Vacant Grassland |

Stip. Fact No. 12.

3. The parcel at 634 Reily Street is 1.765 acres that was improved with a 232-space parking lot as of the Date of Value. Stip. Fact No. 14.

4. Mr. Brinjac testified that RSA used 634 Reily Street for parking as "land banking for future development" and "to have an income stream off of the investment that we made while we were waiting for development opportunities or sale." Vol. I, Tr. 38:4-15 (Brinjac).

---

[1] The Bench Trial was held via videoconference due to the limitations on in-person gatherings imposed by the COVID-19 pandemic.

[2] There are 43,560 square feet in one acre. Vol. III, Tr. 39:8-10 (Heiland).

5. The parking lot at 634 Reily Street was in fair condition at the Date of Value, although due for repaving. Vol. I, Tr. 179:4-13 (Walters); Vol. III, Tr. 165:8-9 (Heiland); Ex. P-62 (Def.'s Objs. and Resps. to Interrogs.) at pgs. 15-16.

6. From 2001 until 2018, RSA leased the 634 Reily Street parcel to PRK-MOR to operate a commercial parking lot. Stip. Fact No. 18.

7. In 2018, PRK-MOR charged $55 per month to rent a parking space at 634 Reily Street. Stip. Fact No. 19.

8. Prior to the announcement of the federal courthouse project, demand for parking at 634 Reily Street was strong. Vol. III, Tr. 25:20-21 (Heiland).

9. RSA's historical operating income and expenses for 634 Reily Street for calendar years 2005-2017 are shown below:

| Historical Operating Income and Expenses | | | | | | | | | |
|------|------------|-----------|---------|-----------|-------------------|-------------|---------------|----------------|---------------------|
| Year | Gross Income | Utilities | Taxes | Insurance | Legal/Professional | License Fees | Miscellaneous | Total Expenses | Net Operating Income |
| 2005 | $90,000 | $208 | $14,956 | $576 | $1,600 | $40 | $56 | $17,436 | $72,564 |
| 2006 | $90,000 | $245 | $15,089 | $600 | $2,350 | $40 | $0 | $18,324 | $71,676 |
| 2007 | $90,000 | $272 | $16,639 | $598 | $2,240 | $40 | $0 | $19,789 | $70,211 |
| 2008 | $90,000 | $766 | $16,883 | $599 | $3,010 | $40 | $0 | $21,298 | $68,702 |
| 2009 | $90,000 | $718 | $17,040 | $576 | $3,113 | $40 | $0 | $21,487 | $68,513 |
| 2010 | $90,000 | $785 | $16,876 | $576 | $2,725 | $40 | $0 | $21,002 | $68,998 |
| 2011 | $84,000 | $785 | $16,583 | $599 | $1,985 | $40 | $0 | $19,992 | $64,008 |
| 2012 | $63,000 | $784 | $17,304 | $489 | $1,985 | $40 | $0 | $20,602 | $42,398 |
| 2013 | $48,000 | $894 | $9,813 | $339 | $1,995 | $40 | $0 | $13,081 | $34,919 |
| 2014 | $29,500 | $1,444 | $688 | $606 | $300 | $0 | $127 | $3,165 | $26,335 |
| 2015 | $20,000 | $1,463 | $8,196 | $352 | $1,595 | $40 | $0 | $11,646 | $8,354 |
| 2016 | $7,359 | $1,583 | $17,430 | $630 | $800 | $50 | $0 | $20,493 | -$13,134 |
| 2017 | $2,667 | $1,657 | $17,707 | $1,440 | $0 | $50 | $0 | $20,854 | -$18,187 |

Stip. Fact No. 21.

10. From 2001 through the Date of Value, the sole source of RSA's income from the Subject Properties was the rental income from PRK-MOR. Stip. Fact No. 22.

11. The parcel at 644 Boyd Street is 0.032 acres (1,413 square feet). The property is a narrow former rowhouse lot that was vacant grassland at the Date of Value. Stip. Fact Nos. 12-13.

12.     The parcel at 1519 North Sixth Street is 0.058 acres (2,517 square feet).  The property is a narrow former rowhouse lot that was vacant grassland at the Date of Value.  Stip. Fact Nos. 12-13.

13.     The Subject Properties are not contiguous.  The three parcels were separated by public roads as of the Date of Value.  Stip. Fact No. 17.

14.     Neither 644 Boyd Street nor 1519 North Sixth Street was used as part of the parking lot operations at 634 Reily Street.  Vol. I, Tr. 82:2-4 (Brinjac); Vol. III, Tr. 96:1-4 (Heiland).

15.     RSA purchased 644 Boyd Street and 1519 North Sixth Street for the purpose of protecting its investment in 634 Reily Street, rather than for an integrated use with 634 Reily Street.  Ex. P-62 (Def.'s Objs. and Resps. to Interrogs.) at pg. 10; Vol. I, Tr. 81:5-23 (Brinjac); Vol. III, Tr. 96:21-97:14 (Heiland).

16.     The Subject Properties were zoned Institutional at the Date of Value, following a City-wide rezoning in 2014.  Stip. Fact Nos. 27-28.

17.     The 2014 rezoning happened after the announcement of the federal courthouse project in April 2010.  Stip. Fact Nos. 8 and 28.

18.     Prior to the rezoning, the 634 Reily Street parcel largely was zoned Residential Planned Conversion, with the portion of the parcel located along North Seventh Street zoned Light Industry; the 644 Boyd Street parcel was zoned Light Industry; and the 1519 North Sixth Street parcel was zoned Business General.  Stip. Fact No. 28.

19.     The City likely rezoned the Subject Properties to Institutional as a result of the announced federal courthouse project.  In the absence of the courthouse project, the City likely would have rezoned the 634 Reily Street and the 644 Boyd Street parcels as Commercial General and the 1519 N. Sixth Street parcel as Commercial Neighborhood.  Vol. III, Tr. 23:13-24:10,

122:7-16 (Heiland); Ex. P-21 (Heiland Rep.) at US-MVG-0003764; -0003841-3843.

20.     Both the Institutional and Commercial General zoning districts designate parking as a permitted use.  Ex. D-13 (Harrisburg Zoning Code) at RSA0001930; Vol. III, Tr. 24:11-13 (Heiland).

21.     Both the Institutional and Commercial General zoning districts designate offices as a permitted use.  Ex. D-13 (Harrisburg Zoning Code) at RSA0001930; Vol. III, Tr. 24:14-16 (Heiland).

22.     The Subject Properties are located within a parking "non-compete area," in which the City of Harrisburg is prohibited from opening any new public parking lots.  However, private parking lots are still permitted to operate within the parking "non-compete area."  Stip. Fact No. 29.

23.     On the Date of Taking, there were no engineering or architectural plans for any proposed development on the Property.  Stip. Fact No. 25.

24.     On the Date of Taking, there were no development approvals in place for the Property. Stip. Fact No. 26.  RSA never sought any development approvals for an office building from the City during its 25 years of ownership.  Vol. I, Tr. 64:2-4 (Brinjac).

25.     RSA never had any business plans to construct an office building or other structure on 634 Reily Street.  Vol. I, Tr. 63:18-20 (Brinjac).

26.     RSA never obtained financing to construct a building on 634 Reily Street.  Vol. I, Tr. 63:21-23 (Brinjac).

27.     RSA did not take any steps to develop the Subject Properties other than prepare some "rough sketches" to show a possible commercial building on the 634 Reily Street Parcel.  Vol. I, Tr. 41:11-20 (Brinjac).

28.     RSA listed 634 Reily Street for sale at $4 million from 2003 to approximately 2007, but received no offers or expressions of interest.  Stip. Fact No. 23.

29.     RSA listed 634 Reily Street for sale at $3.5 million in 2015 but again received no offers or expressions of interest.  Stip. Fact No. 24.

30.     Neither 644 Boyd Street nor 1519 North Sixth Street was offered in connection with either listing.  Ex. P-4 (634 Reily Street listing agreement); Vol. I, Tr. 82:13-19 (Brinjac); Vol. III, Tr. 96:8-18 (Heiland).

*The Courthouse Project*

31.     There have been plans to build a new federal courthouse in the City of Harrisburg since at least the early 2000s.  The existing courthouse does not provide sufficient space, and the layout presents security issues.  Vol. II, Tr. 185:19-186:5 (Low).

32.     General Services Administration ("GSA") initially intended to locate the new federal courthouse in downtown Harrisburg.  Downtown has the infrastructure and amenities that GSA wanted for a courthouse, such as proximity to lawyers' offices, proximity to the rail station, and availability of parking, food service, and coffee shops.  Vol II, Tr. 186:9-187:14, 188:23-189:7 (Low).  The Subject Properties' neighborhood, *i.e.*, midtown by the railroad tracks, does not offer the types of services and amenities that GSA wants proximate to a federal courthouse.  *Id*., Tr. 188:1-4.  In addition, the court itself did not want to place the courthouse in the Subject Properties' neighborhood because, among other reasons such as proximity to lawyers' offices, proximity to the rail station, and availability of parking, food service, and coffee shops, the court "had concerns about the safety of the area and the compatibility of that area for use as a courthouse."  *Id*., Tr. 188:23-189:7.

33.     GSA nonetheless selected the Sixth and Reily Street location for the courthouse,

which includes the Subject Properties, at the insistence of the City and the congressional delegation. In particular, the City wanted to locate the courthouse in midtown, near the Seventh Street "northern gateway" (*i.e.*, by the rail corridor), in order to spur development in the area. Vol. II, Tr. 188:5-15 (Low); Vol. I, Tr. 67:11-17 (Brinjac) (describing Mayor Reed's plan to encourage development in the Seventh Street corridor).

34.     The selection of the Sixth and Reily site formally was announced in April 2010. Stip. Fact No. 8.

35.     Construction had to be delayed until 2018 because Congress did not appropriate construction funding until then. Vol. II, Tr. 189:11-18 (Low). The delay in congressional funding also impacted the timing of the acquisition of the Subject Properties, including the filing of this condemnation suit. *Id*., Tr. 189:19-23; Vol. I, Tr. 44:4-6 (Brinjac).

36.     The federal courthouse currently is under construction, with an anticipated completion date in 2022. Vol. II, Tr. 184:5-10 (Low).

37.     The planned courthouse will be 250,000 square feet in size, with a half-level of underground parking, and have a construction cost of $150 million. The courthouse will be sited on approximately four acres of land. Vol. II, Tr. 185:3-14 (Low).

*The Midtown Harrisburg Neighborhood*

38.     The midtown Harrisburg neighborhood is generally bounded by Forster Street to the South, the Susquehanna River and Waterfront Park to the West, North Seventh Street to the East, and Maclay Street to the North. Stip. Fact No. 11. The midtown neighborhood is adjacent to portions of downtown Harrisburg and the Capitol Complex, with Forster Street dividing the midtown and downtown neighborhoods. Stip. Fact No. 11.

39.     The Subject Properties are located on the periphery of the midtown neighborhood

close to the rail corridor.  Vol. II, Tr. 91:24-92:1 (Walters).

40.     The immediate neighborhood by the Subject Properties historically was residential.
Vol. III, Tr. 19:19-22 (Heiland); Vol. I, Tr. 71:19-21 (Brinjac).  But, by the Date of Value, the
residential neighborhood had been hollowed out with numerous vacant lots and scattered
rowhouses in deteriorated condition, including some boarded up rowhouses.  Vol. III, Tr. 19:24-
20:1 (Heiland); Stip. Fact No. 17 (aerial image of neighborhood with Subject Properties labeled).

41.     The neighborhood has struggled for decades.  By around 1991, RSA had purchased 82
separate residential lots to assemble the 634 Reily Street parcel.  Stip. Fact No. 16; Vol. I, Tr.
38:24-25 (Brinjac).  Of these 82 parcels, only a small number were occupied at the time of
purchase.  Vol. I, Tr. 64:19-65:18 (Brinjac).  Most of the acquired lots were abandoned
rowhouses or vacant lots where the rowhouses already had been demolished.  *Id.*, Tr. 65:19-22.

42.     The square block north of the 634 Reily Street parcel, where the 644 Boyd Street
parcel is located, included a mix of vacant lots and rowhouses in poor condition when the GSA
began acquiring properties for the courthouse project.  Ex. P-58 at US-MVG-0003737 (aerial
photo showing the courthouse site prior to the demolition project by GSA to demolish the
structures that were remaining on the site); Vol. II, Tr. 190:18-191:22 (Low) ("They were in poor
condition.  There was a lot of trash, debris, junk, as well they were in varying states of
disrepair.").

43.     The square block west of the 634 Reily Street parcel, where 1519 North Sixth Street is
located, included vacant land and a donation drop-off center when GSA began acquiring
properties for the courthouse project.  The donation center previously was a Kentucky Fried
Chicken fast food restaurant.  Ex. P-58 at US-MVG-0003737 (aerial photo showing the
courthouse site prior to the demolition project by GSA to demolish the structures that were

remaining on the site); Vol. II, Tr. 191:23-192:19 (Low); Vol. I, Tr. 71:2-8 (Brinjac).

44.     South of the 634 Reily Street parcel is the Bethesda Mission, a shelter for homeless men.  The Bethesda Mission is a Christian-based organization that ministers to the homeless men that it shelters.  Ex. P-58 at US-MVG-0003737 (aerial photo showing the courthouse site prior to the demolition project by GSA to demolish the structures that were remaining on the site); Vol. II, Tr. 162:10-20 (Walters); Vol. II, Tr. 192:20-24 (Low); Vol. III, Tr. 19:11-13 (Heiland).

45.     Adjacent to the Bethesda Mission is a parking lot.  The parking lot was a motel that rented rooms by the hour until, in 2006, Bethesda Mission purchased the motel in order to end the onsite prostitution.  Vol. II, Tr. 162:6-9,163:1-18 (Walters).

46.     South of the Bethesda Mission are the Jackson and Lick Towers, which are public housing apartment towers owned by the Harrisburg Housing Authority.  Vol. I, Tr. 70:14-22 (Brinjac); Vol. II, Tr. 193:1-7 (Low); Vol. III, Tr. 21:6-14 (Heiland).

47.     The immediate neighborhood also includes the 1500 Condominium Tower, an office building for the Pennsylvania Department of Labor, and the headquarters for the Pennsylvania Higher Education Assistance Agency (PHEAA).  Vol. III, Tr. 19:3-5, 21:15-22:15 (Heiland); Ex. P-28 (aerial image showing neighborhood).

48.     Ralph Vartan, a prominent real estate owner, developed the 1500 Condominium in anticipation of the federal courthouse project.  The project, completed in 2012, initially was unsuccessful.  Vol. III, Tr. 21:24-22:15 (Heiland); Vol. I, Tr. 166:9-16 (Walters) ("And [the 1500] at one point was not doing as awesome as it is today.  Because it's doing very well now. But when it was originally built, it took a little while to get going.  But now he's looking like a genius, because it's a very popular place.").

49.     The PHEAA office building, which is about 350,000 square feet in size, is located a

couple blocks south of the Subject Properties and is the largest office building in the area. Vol. I, Tr. 41:6-9, 80:18-81:4, 91:11-17, 92:2-5 (Brinjac). The PHEAA building was constructed sometime before 1993. Vol. I, Tr. 41:7, 88:20-21 (Brinjac); Vol. III, Tr. 30:8-12 (Heiland).

50. North of the property, on a site which used to be rowhouses, the State Archives Building is currently being constructed. Vol. I, Tr. 167: 17-21 (Walters). The State Archives Building will be 150,000 square feet in size and used for storage, akin to a warehouse. Vol. IV., Tr. 21:23-22:3 (Walters); Trial Transcript, Vol. III, 30:22-24, 141:8-10 (Heiland).

*RSA's Valuation*

*RSA's Proposed Highest and Best Use*

51. RSA contended that the highest and best use of the Subject Properties was for institutional development of a professional office building, to the scale of around 350,000 square feet. Vol. I, Tr. 189:11-14 (Walters) ("Q. And what did you determine the highest and best use of the subject property was? A. The most likely development use was for some form of a professional office building."); Vol. II 9:2-13 (Walters), 18:19-23 (Walters) ("Q. Just so the record is clear, then, was your ultimate conclusion that the highest and best use as vacant was for institutional development consistent with the scale described by Mr. Snyder? A. Yes."), 20:10-21:3 (Walters). In support, RSA offered the expert report and testimony of Jeffrey Walters, MAI, a real estate appraiser. Stip. Fact No. 54. RSA also offered the expert opinion testimony of James Snyder, P.E., an engineer, regarding the potential development of the Property. Stip. Fact No. 56. Mr. Snyder's conceptual site plan only pertains to 634 Reily Street—it did not include 644 Boyd Street and 1519 North Sixth Street in the conceptual site plan because of those parcels' small size and disconnection from 634 Reily Street. Ex. D-12 (Snyder Rep.) at 1; Vol. I, Tr. 123:23-124:7 (Snyder).

52.     Mr. Walters's valuation hinges on the hypothetical size of a hypothetical office building.  Mr. Walters opined that market participants would value the Subject Properties based on a hypothetical 357,000 square foot office building that could be constructed, by right, on the 634 Reily Street parcel.  Mr. Walters then multiplied the size of this hypothetical building by his $11.20 price per square foot, resulting in a $4 million valuation (357,000 sq. ft. x $11.20/sq. ft. = $3,998,400).  Ex. D-15 (Walters Rep.) at pg. 51.

53.     Mr. Walters also speculated that market participants would consider that a 400,000 square foot office building could be constructed after obtaining variances.  Mr. Walters then multiplied the size of this hypothetical building by a different price of $10 per square foot, resulting in a $4 million valuation (400,000 sq. ft. x $10/sq. ft. = $4,000,000).  Ex. D-15 (Walters Rep.) at pgs. 51-52.

54.     A 357,000 square foot office building would be among the ten largest office buildings—and one of the largest buildings of any type—in the City of Harrisburg.  Vol. II, Tr. 91:10-20 (Walters); Vol. I, Tr. 92:22-25 (Brinjac) (downtown office buildings tend to be 150,000-200,000 square feet).

55.     Mr. Walters's report does not analyze whether demand for such an office building existed at the Date of Taking (Ex. D-15), and, at trial, RSA did not put forward any evidence of demand other than a few anecdotes about institutional buyers needing new office space (*see infra* at ¶¶ 182-187).  Mr. Walters testified in deposition that he did not calculate the demand for new office space at the Date of Value.  Vol. II, Tr. 95:23-96:2 ("Q. You were asked 'Did you calculate the demand for new office space in Harrisburg as of the date of value?'  And you answered 'No.'  Did I read that correctly?  A. You did.").

56.     Mr. Walters did not analyze the supply of existing office space in Harrisburg as of the

Date of Value, and whether that supply met market needs; nor did he forecast the capture rate of a hypothetical office building at the Subject Properties or how long it would take to lease-up the available office space.  Vol. II, Tr. 96:3-14 (Walters).

57.    Mr. Walters testified generally that "that there was a lot of growth promotion of development along the 7th Street corridor as well as 6th Street in that area of the subject property."  Vol. I, Tr. 162:6-9.

58.    RSA's market and development expert, Gary Nalbandian, testified that "[t]here is a strong and growing market for commercial development in midtown Harrisburg market," but in so doing, gave examples of more recent developments that post-date the Date of Value.  Exhibit D-20 (Nalbandian Rep.), pg. 1; Trial Transcript, Vol. III, 199:17-201:21.  Mr. Nalbandian cited his own, post-taking planned development in midtown as evidence of demand.[3]  But the evidence established that Mr. Nalbandian's project is being driven by the federal courthouse project.  Vol. III, Tr. 217:2-13 (Nalbandian) (development plan includes parking garage that will be "of critical importance" to the federal courthouse project).  Further, Mr. Nalbandian's business partner stated in a public meeting that the development could not go forward without subsidies.  *Id.*, Tr. 221:6-8.  In all events, the project principally is a residential and parking project, with only minimal space set aside for office (approximately 1,500 square feet of office space according to the zoning application).  *Id.*, Tr. 215:9-217:1.[4]

---

[3] This project is not discussed in Mr. Nalbandian's report, presumably because it is new.  The project just received initial zoning approval from the City, some three years after the Date of Value in this case.  Vol. III, Tr. 200:14-15 (Nalbandian) ("I was approved Tuesday night [before trial]…").

[4] Mr. Nalbandian also discussed a Green Works apartment development, the Susquehanna Art Museum, and the Harrisburg Area Community College as examples of midtown development, although they were not discussed in his report.  *Compare* Ex. D-20 (Nalbandian Rep.) *with* Vol. III, Tr. 200:8-11, 201:18-21 (Nalbandian).  None of these projects is an office development.  The

59.     Just three of Mr. Walters's 11 comparable properties were purchased for new

construction:  Sale 1, Sale 8, and Sale 11.  The other eight comparable properties were purchased

for parking.  Vol. II, Tr. 110:8-17 (Walters).

60.     None of Mr. Walters's 11 comparable sales was purchased for constructing new office

space.  Harrisburg University purchased the Sale 1 and 11 properties for academic facilities.

Vol. II, Tr. 112:22-113:1, 119:21-120:1 (Walters).  The Sale 8 property was purchased for an

approved 14-story hotel.  *Id.*, Tr. 126:19-22 (Walters); Ex. P-69 (approval for 14-story hotel).

*Mr. Walters's Methodology*

61.     Mr. Walters employed the sales comparison approach to value the Subject Properties.

Vol. II, Tr. 109:1-3 (Walters).  The sales comparison approach requires an appraiser to select a

basis for comparing properties, such as a price per acre, price per parking space, or price per

square foot of buildable area.  *Id.*, Tr. 110:18-24.

62.     The unit of comparison selected by an appraiser needs to track market behavior, *i.e.*,

be utilized by buyers and sellers in the applicable market.  Vol. II, Tr. 110:25-111:5 (Walters)

("Q. You agree that the market would dictate the appropriate unit of comparison; correct?  A.

Yes.  Q. So the unit of comparison needs to be based on buyer and seller behavior?  A. Yes.");

Vol. III, Tr. 41:16-20 (Heiland).

63.     The wrong unit of comparison will result in an unreliable valuation.  Vol. II, Tr.

111:6-8 (Walters) ("Q. And the wrong unit of comparison may result in an incorrect value

conclusion; correct?  A. Yes.").

---

Green Works development Mr. Nalbandian referenced is 150 apartments, not an office building
development.  Vol. III, Tr. 201:20-21 (Nalbandian).  Harrisburg Area Community College is an
academic institution that is decreasing its footprint in midtown. Vol. III, Tr. 33:20-34:2
(Heiland).  The Susquehanna Art Museum is an art museum.

*Mr. Walters's Sales Comparison Approach Valuation: Price Per Square Feet of Buildable Area*

64.    For his appraisal of the Subject Properties, Mr. Walters used price per square foot of buildable area as the unit of comparison.  Ex. D-15 (Walters Rep.) at pg. 48 (pdf pg. 65); Vol. II, Tr. 111:9-12 (Walters).

65.    In particular, for Mr. Walters's three sales where there were plans to construct a building on the property at the time of purchase (Sales 1, 8 and 11), Mr. Walters developed a price per square foot of buildable area by dividing the sale price of those properties by the size of building actually constructed (Sales 8 and 11) or the size of the building planned at the date of Mr. Walters's appraisal (Sale 1).  Ex. D-15 (Walters Rep.) at pgs. 48, 50-51; Vol. II, Tr. 111:16-23 (Walters) ("Q. So your price per buildable areas relies solely on those three sales; correct?  A. In this analysis, yes."), 50:10-51:9 (Mr. Walters noted an error in his report—that the sales price for Sale 8 should be $1,550,000 rather than $1,000,000—and after adjusting the calculation to $28.57 per square foot of buildable area, confirmed that it would not change his ultimate conclusion about the value of the subject property), 122:14-18 (regarding Sale 11), 114:19-25 (regarding Sale 1, "[t]here had been gyrations of prospective building size, and we went with the most recent as of the date of the appraisal").

66.    This unit of comparison does not track market behavior and accordingly produces unreliable results.  Price per square foot of buildable area is an appropriate unit of comparison for markets that "are incredibly dynamic, that are very active where buyers regularly build out properties to their maximum potential."  Vol. III, Tr. 39:16-22 (Heiland) (indicating that Harrisburg is not this type of dynamic market), 41:3-5 ("My experience with land in the city is that buyers generally do not maximize these sites.  They build much smaller buildings than what is [the] potential.").

67.     The market for new office space in the City of Harrisburg is not sufficiently dynamic to employ price per square foot of buildable area as the unit of comparison for purchases of land or parking lots.  Vol. III, Tr. 39:25-41:5 (Heiland); *see also, e.g.*, Ex. P-45 at US-MVG-0000530 (appraisal performed by Greg Rothman, MAI, of one of the Heiland Land Sale 3 parcels using price per square foot land as the unit of comparison, not price per square foot of buildable area). Numerous examples establish that buyers do not construct the maximum, by-right, office building or other structure when they purchase land in the City of Harrisburg.  In fact, for <u>none</u> of the myriad properties discussed at trial did the buyer construct the maximally sized, by-right structure:

> a.  Walters Sales 2, 3, 4, 5, 6, 7, 9, and 10:  These properties were purchased for parking even though each sale had development potential.  Vol. II, Tr. 26:5-13 (Sale 2), 26:22-27:5 (Sale 3), 27:6-17 (Sale 4), 27:20-23 (Sale 5), 28:4-6 (Sale 6), 28:9-10 (Sale 7), 29:18-20 (Sale 9), 29:23-30:1 (Sale 10) (Walters).
>
> b.  Walters Sale 1:  Harrisburg University had plans to construct a 36-story, 562,700 square foot academic building and hotel on the property.  P-26 at US-MVG-0004713; Vol. II, Tr. 118:13-22 (Walters).  Harrisburg University has scaled back its plans to a 235,000 square foot academic building.  Ex. D-17 at ¶ 4.   A portion of this sale, which was an assemblage of four parcels, is Heiland Parking Lot Sale 2.  Stip. Fact Nos. 32, 51.
>
> c.  Walters Sale 8:  The buyer acquired land with approvals in place for a 14-story hotel having a square footage of approximately 148,000 square feet.  Ex. P-69; Vol. II, Tr. 129:10-12 (Walters).  The hotel never got built.  Five years after the initial acquisition, in 2012, a bank retail branch and office space totaling 54,239

square feet were constructed.  Vol. II, Tr. 132:3-13 (Walters); Ex. D-15 at unnumbered page discussing Sale 8.

d.  Walters Sale 11:  Conceptual plans supported a potential high-rise building totaling 990,000 square feet.  Harrisburg University instead built an academic tower totaling 349,587 square feet.  Vol. II, Tr. 122:5-10 (Walters); Ex. D-15 at unnumbered page discussing Sale 11.

e.  Heiland Land Sale 1:  The buyer contracted to purchase this nearly one-acre property for a 6,800 square foot AutoZone rather than build the maximum sized office building or other structure.  Vol. III, Tr. 47:12-18 (Heiland).

f.  Heiland Land Sale 2:  The buyer intends to hold the land rather than develop it. Vol. III, Tr. 56:5-7 (Heiland).

g.  Heiland Land Sale 3: A portion of the State Archives Site was used for Heiland Land Sale 3.  The entire State Archives site is 2.57 acres, larger than the 634 Reily Street parcel, but the building will be 150,000 square feet.  Vol. IV, Tr. 22:7-22 (Walters) ("Q. And so if the 357,000 square foot building could fit at 634 Reily Street, you would expect 150,000 square feet would not be the maximum size building that could fit at the Archives site; correct?  A. I would make that assumption, yes.").

h.  Heiland Land Sale 4:  The buyer built a 14,950 square foot senior living facility on approximately 2.05 acres of land (1.45 acres of which transacted as Heiland Land Sale 4).  Ex. P-21 (Heiland Rep.) at US-MVG-0003878; Vol. III, Tr. 145:23-25 (Heiland).  The land was zoned Commercial General, which has a height limitation of 100 feet.  Ex. P-21 at US-MVG-0003878; Ex. D-13 (Zoning

Code) at RSA0001937. There is no evidence that the 14,950 square foot building was the maximum size allowed by-right.

    i.    Heiland Parking Lot Sales 1, 3, and 4: The buyers purchased these properties for continued parking notwithstanding their development potential. Vol. III, Tr. 75:15-76:2, 85:13-15, 85:22-86:3, 86:14-22, 88:23-89:11 (Heiland).

    j.    State Health building: State Health intends to lease a built-to-suit building of only 120,000 square feet on 11 acres of land. Vol. III, Tr. 30:25-31:17 (Heiland).

    k.    New federal courthouse: The new federal courthouse is sited on four acres (including the Subject Properties) and will be 250,000 square feet in size. Vol. II, Tr. 185:3-6 (Low).

    l.    Brinjac-owned parking lot: Mr. Brinjac owned a parking lot in downtown Harrisburg, in a prime location on Second and Walnut Streets, from 1988 to 2015. Vol. I, Tr. 85:13-16 (Brinjac). Mr. Brinjac testified that the parking lot has been ripe for development for years. *Id.*, Tr. 85:17-19. But the property remains a parking lot to this day. *Id.*, Tr. 86:5-8.

68.    RSA's efforts to sell the 634 Reily Street parcel further establish that buyers and sellers in the City of Harrisburg do not trade land and parking lots on a price per square foot of buildable area. In determining a list price for 634 Reily Street, RSA's broker, Jim Helsel, developed a price per square foot of land, not buildable area. Ex. P-1 (Helsel letter); Vol. I, Tr. 74:6-75:25, 93:7-15 (Brinjac). Mr. Brinjac likewise testified that he valued 634 Reily Street based on a price per square foot of land when discussing his experience putting the property out for sale. Vol. I, Tr. 42:18-43:21 (Brinjac).

69.    Mr. Walters testified that he could use this valuation approach only because he had a

post-taking, litigation-generated, engineering plan from a credible, licensed engineer. Vol. I, Tr. 185:10-15; Vol. II, 143:7-15 (Walters).

70.     Mr. Walters testified that buyers and sellers determine a selling price based on the maximally sized, by-right building that can be constructed on a property. Vol. II, Tr. 81:21-82:3 (Walters) ("Q. So are you saying that a buyer would have to pay based on its potential, even if they don't intend to use it all? A. That's correct. If I was selling that property, if I owned it, I wouldn't want to undersell myself by offering a site that could accommodate a 400,000 square foot building when the user only wanted to use it for 200,000. That's too bad."), 170:2-5 (same). Mr. Walters accordingly valued the Subject Properties based on the maximally sized, by-right office building that could be constructed: 357,000 square feet. Ex. D-15 (Walters Rep.) at pg. 51.

71.     For an apples-to-apples comparison, Mr. Walters needed to determine the maximally sized, by-right structure that could be built on each of his comparable sales. Vol. III, Tr. 42:22-43:1 (Heiland) ("If I'm going to apply [a unit rate of price per square foot of buildable area] to the maximum potential of my subject property, I'm going to have to develop the unit rate for my comparable sale based upon its maximum potential. If you didn't do that, you would end up overvaluing the property.").

72.     Mr. Walters did not attempt to determine the maximally sized, by-right structure for any of his comparable sales, including the three sales that he used to develop a price per square foot of buildable area. Ex. D-15 (Walters Rep.) (no discussion of maximum, by-right size permitted on each property when describing each comparable sale); Vol. II, Tr. 115:8-11 (Sale 1), 122:2-4 (Sale 11), 152:15-24 (Sale 3) (Walters).

        a.  For his Sale 1, Mr. Walters developed a unit price of $8.23/sq. ft. by dividing the

final sale price of $3.18 million by the planned size of the Harrisburg University academic tower at the time of Mr. Walters's appraisal, 386,000 square feet ($3.18 million / 386,000 sq. ft. = $8.23). Ex. D-15 (Walters Rep.) at unnumbered page discussing Sale 1, pg. 51; Vol. II Tr. 19-25 (Walters). But a materially larger tower could have been constructed on the Sale 1 property by right. There is no height restriction in the Sale 1 property's zoning designation, Downtown Center.[5] Ex. D-13 (Zoning Code) at RSA0001937. Per the Declaration of Dr. Eric Darr, the President of Harrisburg University, Harrisburg University intended to build a much larger, 36-story, 562,700 square foot academic tower and hotel. Ex. P-26 (Darr Declaration) at US-MVG-0004713; Vol. II, Tr. 118:13-22 (Walters). This initially planned structure would imply a price of $5.65 per square foot of buildable area ($3.18 million / 562,700 sq. ft. = $5.65). Vol. II, Tr. 118:16-119:1 (Walters).

b.  For his Sale 8, Mr. Walters developed a unit price of $28.57 by dividing the final sale price of $1.55 million by the size of the retail/office space actually constructed on the property several years later, 54,239 square feet ($1.55 million /

---

[5] Mr. Walters agreed that the zoning does not impose a height restriction. Vol. II, Tr. 114:5-9. He nonetheless testified that a building cannot be higher than 333 Market Street, where cell towers for the Commonwealth are located. *Id.*, Tr. 114:9-16. The fact that Harrisburg University had plans for a 36-story building belies Mr. Walters's unsupported contention. Ex. P-26 at ¶ 5. Moreover, Mr. Walters incorrectly testified that the City of Harrisburg would not allow any structure to exceed four-to-five stories at his Sale 8 location when, in fact, the City had approved a 14-story hotel. *Compare* Vol. II, Tr. 127:7-9 ("They will not allow a building more than four stories or five stories in that area") *with* Ex. P-69 (City approval for 14-story hotel). In all events, RSA put forward no evidence as to the height of the 333 Market Street cell towers and otherwise did not put forward any evidence as to the maximally sized, by-right building that could be constructed.

54,239 sq. ft. = $28.57).[6]  Vol. II, Tr. 50:19-51:11 (Walters); Ex. D-15 at unnumbered page discussing Sale 8.  Mr. Walters did not know that, prior to the Sale 8 transaction, the City of Harrisburg had approved a 14-story hotel totaling approximately 148,000 square feet.[7]  P-69; Vol. II, Tr. 129:10-12 (Walters).  This planned structure—with required approvals in hand—would imply a price of $10.47 per square foot of buildable area ($1.55 million / 148,000 sq. ft. = $10.47).

c. For his Sale 11, Mr. Walters developed a unit price of $11.44 by dividing the final sale price of $4 million by the size of the academic tower actually built by Harrisburg University totaling 349,587 square feet ($4 million / 349,587 sq. ft. = $11.44).  Ex. D-15 (Walters Rep.) at unnumbered page discussing Sale 11.  But a materially larger tower could have been constructed, by right, on the Sale 11 property.  There was no height restriction on the property at the time of sale (and continues to be no height restriction).  *Id.*  According to an appraisal of the Sale 11 property previously performed by Mr. Walters, an engineering firm had indicated that "the site could accommodate a 30-story building, which would increase potential gross buildable area to 990,000 square feet."  Vol. II, Tr. 123:20-25 (Walters).  A 990,000 square foot structure would imply a price of

---

[6] This price is materially different than the $18.44 unit rate set forth in Mr. Walters's appraisal. Mr. Walters testified that he erroneously believed that the Sale 8 property sold for $1 million when in fact it sold for $1.55 million.  Mr. Walters testified that correcting this mistake, and adjusting his unit rate up 55%, did not impact his value conclusion because "the unit rates can change over time."  Vol. II, Tr. 51:7-19 (Walters).

[7] According to the Subdivision and Land Development Plan approved by the City of Harrisburg, the hotel would have a site footprint of 10,563 square feet.  Ex. P-69, p. 1 (Site Data). Multiplying this square footage by 14 floors (Ex. P-69, p. 1 (General Note 1)) totals 147,882 square feet.

$4.04 per square foot of buildable area ($4 million / 990,000 sq. ft. = $4.04). *Id*.,

Tr. 124:1-10.

73. Walters's Sales 1, 8 and 11 are also vastly superior to the Subject Properties. All three properties are located in the heart of downtown Harrisburg, near the Capitol Complex, near other office buildings, retail, restaurants, and hotels. Vol. II, Tr. 68:6-24 (Walters), Vol. III, Tr. 79:7-10 (Heiland) (Sale 1 location); Vol. II, Tr. 73:16-20, 125:4-126:18 (Walters), Vol. III, 111:2-10 (Heiland) (Sale 8 location); Vol. II, Tr. 73:20-24 (Walters), Vol. III, 115:7-10 (Heiland) (Sale 11 location).

74. Downtown properties are more demanded, desirable properties than properties in midtown and accordingly sell for higher prices. Vol. I, Tr. 84:4-8 (Brinjac); Vol. II, Tr. 67:22-25, 68:1-24 (Walters). The downtown neighborhood and the Capitol Complex are the centers of employment in Harrisburg. Vol. III, Tr. 20:6-20 (Heiland); Ex. P-21 (Heiland Rep.) at US-MVG-0003814-3815. The largest buildings in the City of Harrisburg are concentrated in the downtown area. Vol. II, Tr. 91:21-23 (Walters).

75. Separate from their superior location, Sales 1, 8 and 11 otherwise are poor indicators of value of the Subject Properties:

    a. <u>Sale 1</u>: For his Sale 1, Mr. Walters considered two different transactions with two different sellers. One of those transactions involved an interested seller, Bob Ortenzio, who sat on the Board of Trustees of the buyer, Harrisburg University. Vol. II, Tr. 70:17-71:7 (Walters). Mr. Walters evidently did not investigate whether the transaction was arms-length, and he provided conflicting testimony as to whether the sale should be adjusted upward or downward for buyer/seller motivations. *Id.*, Tr. 134:2-22 (Walters). Further, the Ortenzio transaction

concerned the sale of "a lot" of apartment units that recently had been renovated. *Id.*, Tr. 113:18-114:2 (Walters).

b.  <u>Sale 8</u>:  At the time of sale in August 2007, the Sale 8 property had approved plans in place for a 14-story hotel, but the Subject Properties had no development approvals.  Ex. P-69; Vol. II, Tr. 129:10-19; Stip. Fact No. 26.  Properties with approvals in place are more demanded, valuable properties.  Vol. III, Tr. 50:9-51:3 (Heiland).  Further, the Sale 8 property sold in a more active real estate market, prior to the Great Recession.  Vol. II, Tr. 130:10-12 (Walters).  The Sale 8 property also is fraction of the size of the Subject Properties (0.305 acres), is in a different market than the Subject Properties, and likely would have different buyers.  Stip. Fact No. 39; Vol. II, Tr. 133:10-15 (Walters) ("Q. So you agree that Sale 8 would be a different market than the subject property; right?  A. Yes.  Q. The two properties would likely have different buyers; correct?  A. Yes.").

c.  <u>Sale 11</u>:  The Sale 11 property transacted in May 2005, about 13 years prior to the Date of Value.  Stip. Fact No. 42.  Such dated sales are unreliable indicators of value.  Vol. III, Tr. 88:14-21 (Heiland).[8]

76.  Mr. Walters's reliance on Sales 8 and 11 to value the Subject Properties discredits his

---

[8] Dated sales are problematic not only because the market changes over time but because the sales are difficult to verify and neighborhoods evolve.  Vol. I, Tr. 152:3-5 (Walters) ("Inevitably, over time people forget, or they remember it slightly different.  So it's nice to get a real fresh perspective on sales."); Vol. II, Tr. 135:7-9 (Walters) ("[S]o it's next to impossible to have 10 or 12 or 15 years of time and have any kind of adjustment that would make any sense at all."); Vol. III, Tr. 149:15-23 (Heiland) ("So this is why looking back in time so far at data points is problematic…. Transitpark was not in existence in 2008.  The city's situation was different in 2008.  There are so many different things.").

valuation, because they are older sales.[9]

\*   \*   \*

77.     No facts or data support Mr. Walters's final value conclusion of $10 per square foot of buildable area.  Vol. II, Tr. 35:8-9 (Walters) ("I felt like $8, $9, $10 was the indicator at the time"), 81:2-12 ("Even knowing that that first sale is now adjusted upward to $13, I'm still inclined to say 10 to 12 bucks a foot for the subject property"), 81:8-10 ("Having done a lot of appraisals in downtown Harrisburg and familiar with the market, buyer behaviors, I was in the $10-11-12 a square foot.").

78.     $10 per square foot of buildable area is the exact same unit rate Mr. Walters determined in his 2016 appraisal, when he did not have the benefit of Sale 1, which, according to him, sold at a unit rate of $8.23.  Vol. II, Tr. 139:1-7, 139:13-140:9 (Walters).  The new Sale 1 data point, if anything, should have lowered Mr. Walters's valuation conclusion to less than $10, but Mr. Walters determined a unit rate of $10, or $11.20 with a 12% premium in his 2019 appraisal for this case.  *Id.*, at 139:13-140:19.

79.     Nor do any facts or data support the 12% premium that Mr. Walters tacked on to his unit rate, for a final price of $11.20.  Vol. II, Tr. 140:20-141:10 (Walters).  His 2016 appraisal included no such premium.  *Id.*, Tr. 139:4-9, 149:8-10.  Mr. Walters testified that the premium could have been 5% but, by making it 12%, his value came in at $4 million, the same as his 2016 appraisal.  *Id.*, Tr. 141:5-23.

80.     Mr. Walters's report purports to justify the 12% premium as follows:  "Although a

---

[9] Mr. Heiland used a portion of Mr. Walters's Sale 1 transaction (the parking lot at 222 Chestnut Street, not the recently renovated apartment buildings) in order to evaluate the market for parking, due to the overall dearth in parking lot sales.  Vol. III, Tr. 80:6-12 (Heiland).  Mr. Heiland explained that the transaction "provides limited information, other than…that the subject's value is much less than the value of [222 Chestnut]."  *Id*.

$10.00 per square foot of building area unit rate would be justified … it is appropriate to assign a premium of 12% because there is less risk associated with a proposed development that does not require any variances or zoning relief." Ex. D-15 (Walters Rep.) at pg. 51.  This reasoning would make sense only if the planned buildings for Sales 1, 8 and 11 required a zoning variance at the time of their sales.  But no such variance was needed for Sale 8: that property sold with approvals already in place for a 14-story hotel.  Ex. P-69.  For Sales 1 and 11, presumably no such variances were needed because there was (and is) no height restriction for either downtown location.  Ex. D-13 (Zoning Code) at RSA0001937; Vol. II, Tr. 122:11-13 (Walters) (stating that he was not aware of any variances needed to construct the building on the Sale 11 property).

*Mr. Walters's Sales Comparison Approach Valuation: Price Per Acre*

81.     As a "check for reasonableness," Mr. Walters separately calculated a $2 million price per acre using 11 comparable sales.  Mr. Walters then multiplied his $2 million price by the Subject Properties' 1.85 acres, arriving at an alternative value conclusion of $3,700,000 ($3,530,000 for the 634 Reily Street parcel).[10]  Ex. D-15 (Walters Rep.) at pg. 52.

82.     Mr. Walters arrived at his unit rate of $2 million/acre by (1) developing a price per acre unit rate for each of his 11 sales, (2) eliminating the two highest and the two lowest unit rates, and then (3) taking the average of the unit rates of the seven sales not eliminated.[11]  Ex. D-15 (Walters Rep.) at pg. 52.

---

[10] In his report, Mr. Walters multiplied his $2 million price by 1.97 acres.  D-15 at pg. 52.  At trial, Mr. Walters acknowledged this was an error, and that the correct acreage is 1.85 acres.  Vol. I, Tr. 181:13-19 (Walters).  Mr. Walters stated that this error did not impact his ultimate opinion of value because he relied on Mr. Snyder's building size estimate, which only considered the land size of 643 Reily Street parcel (1.765 acres).  Vol. I, Tr. 181:13-183:2

[11] If Mr. Walters arrived at his $2 million price per acre by some method other than averaging his sales, his report does not explain the method, nor did his testimony at trial.  See Ex. D-15 at pg. 52 (Walters Rep.) ("The average unit rate is approximately $2,000,000 per acre.").

83.     Mr. Walters's report contains a sales comparison adjustment which purports to make adjustments for factors such as conditions of sale, date of sale, location, and other factors.  Ex. D-15 at pg. 49.  Mr. Walters's "adjustments" are set forth in the table at page 50 of his report. He adjusted his Sales 1, 2 and 3 upward to include demolition costs, but otherwise made <u>no adjustment to any of his sales</u>.  This is shown in the below table imaged from Mr. Walters's report, where Mr. Walters's $/Acre is the same as his "Adjusted $/Acre" (with the exception of the sales adjusted upward for demolition costs):

| Sale | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| $/Acre | $4,818,276 | $508,333 | $1,612,903 | $446,429 | $3,428,571 | $1,428,571 | $878,378 | $3,225,806 | $1,000,000 | $1,860,465 | $5,263,158 |
| Adjusted $/Acre | $4,909,185 | $647,222 | $1,889,401 | $446,429 | $3,428,571 | $1,428,571 | $878,378 | $3,225,806 | $1,000,000 | $1,860,465 | $5,263,158 |

Ex. D-15 at pg. 50 (compare the row "$/Acre" with the row "Adjusted $/Acre").

84.     This means, for example, that, in calculating his $2 million price, Mr. Walters included the Sale 5 price of $3,428,571/acre, without making any adjustment to those prices (*e.g.*, Mr. Walters did not adjust his Sale 5 property for size and the impacts of economies of scale even though the Sale 5 property is just 0.07 acres in size, or 4% of the size of the 634 Reily Street parcel).  Mr. Walters ignored any purported qualitative analysis by simply averaging the unit prices—even though, per Mr. Walters, appraisers are "discouraged from … using averages" and "[t]he rate per acre requires a lot of adjustments…."  Vol. II, Tr. 56:9-10, 83:24-25.

   *Mr. Walters's Comparable Sales*

85.     Most of the properties Mr. Walters selected for comparison were not reliable indications of value for the Subject Properties because they were very different from the Subject Properties, in ways that are relevant from an appraisal standpoint, as discussed below.

   • Walters Sale 1 (222 Chestnut Street and 24-28 South 3rd Street)

86.     Walters Sale 1 is useful only for demonstrating the absolute high-end market value for

parking lots in Harrisburg.  Vol. III, Tr. 80:6-12 (Heiland) ("It really provides limited information, other than to tell me that the subject's value is much less than the value of this lot.").  Mr. Walters himself agreed that it would be "ridiculous" to apply the $4.8 million price per acre indicated by his Sale 1 property to value the Subject Properties.  Vol. II, Tr. 145:3-7 (Walters).

87.     Presumably for this reason, Mr. Walters excluded the Sale 1 property in determining his price per acre.  Ex. D-15 (Walters Rep.) at 52 (price per acre check for reasonableness "eliminat[ed] the two highest and two lowest adjusted unit rates").  *Inter alia*, the Sale 1 property is located in the heart of downtown, in a vastly superior location, and was improved with several newly renovated apartments.  *See supra* at ¶¶ 72(a), 75(a).  In addition, the Sale 1 property has a much smaller area than the Subject Properties (0.66 acres versus 1.85 acres).  Stip. Fact No. 32. On a per-unit basis, smaller-sized properties sell for more than larger-sized properties because of economies of scale.  Vol. III, Tr. 37:24-38:10 (Heiland).

- Walters Sale 2 (157 Paxton Street)

88.     Walters Sale 2 provides an appropriate basis for valuing the 634 Reily Street parcel. The Sale 2 property was purchased in June 2015, within three years of the Date of Value.  Stip. Fact No. 33.  The property has a superior location to the Subject Properties as it is located on the periphery of downtown Harrisburg, on one of the major gateways into the city, and therefore is highly visible to traffic.  Vol. II, Tr. 146:19-147:3 (Walters).  But the property's development potential is limited by its location in the flood plain.  Ex. D-15 (Walters Rep.) at unnumbered page discussing Sale 2.

- Walters Sale 3 (The Bertolino Building)

89.     PHEAA acquired the 129,000 square foot Bertolino Building in 2014 for $3.5 million

and then, after purchase, demolished the building for parking. Stip. Fact No. 34; Vol. II, Tr. 147:20-25 (Walters).

90. PHEAA acquired a relatively new office building constructed in 1990, in fair condition, not a tear down. Vol. II, Tr. 148:1-2 (Walters) (1990 construction); Vol. III, Tr. 106:20-24 (Heiland) (fair condition). The property was marketed for sale as an office building, and the owner installed a new roof in 2011. Vol. II, Tr. 148:17-19 (Walters); Ex. P-24 (marketing brochure); Vol. III, Tr. 105:16-18, 106:20-24 (Heiland). PHEAA considered that it was purchasing an office building, not a tear down, and priced the property accordingly. Vol. III, Tr. 107:12-17 (Heiland).

91. The courthouse project influenced this sale. PHEAA acquired the Sale 3 property to mitigate the anticipated loss of parking at the 634 Reily Street parcel caused by the courthouse project.[12] Vol. III, Tr. 104:12-20, 107:23-108:4 (Heiland); Vol. II, Tr. 150:13-21 (Walters); *see also* Ex. P-3 (email from J. Helsel to J. Brinjac) (stating that PHEAA may have overpaid by as much as 30% to acquire a nearby property) ("I've seen plottage factors as high as 30% meaning that an adjacent user is willing to pay 30% more for a property than anyone else simply because of its location to the buyer's other property.").

- Walters Sale 4 (829 and 1001 Market Street)

92. Walters Sale 4 is the same as Heiland Parking Lot Sale 4. As discussed below, this Sale indicates a price per parking space of $3,846 and may be used to value the 634 Reily Street parcel. *See infra* at ¶¶ 162-164.

_____

[12] In fact, PHEAA was likely to overpay for the Sale 3 property as a "captive" neighboring property owner with limited options to secure additional parking, even disregarding the courthouse project. PHEAA had already invested in office building capacity for 2,300 employees, but without sufficient onsite parking for those employees. Vol. I, Tr. 66:21-24 (Brinjac); Vol. III, 104:21-24 (Heiland) (discussing PHEAA as a "captive buyer").

- Walters Sale 5 (925 Penn Street)

93.     Walters Sale 5 does not compare to the Subject Properties even though, at the time of transaction, the property was improved with a 27-space parking lot.  Vol. II, Tr. 40:17-20 (Walters).  The property's 0.07-acre size is a tiny fraction (4%) of the 1.765-acre size of 634 Reily Street.  Stip. Fact Nos. 12 and 36; Vol. II, Tr. 157:14-18 (Walters); Vol. III, Tr. 108:8-10 (Heiland).  The property would not be a substitute for the Subject Properties and should not be used as a comparable sale.  Vol. II, Tr. 157:20-22 (Walters); Vol. III, Tr. 14:14-16 (Heiland) ("And when you're looking at comparable sales that are significantly smaller, those unit rates tend to be drastically higher.").

94.     The Sale 5 property otherwise does not provide a reliable basis for valuing the Subject Properties.  The property sold in July 2011, more than six-and-one-half years prior to the Date of Value and is located in "a more densely developed populated area of midtown."  Stip. Fact No. 36; Vol. III, Tr. 108:10-12, 108:24-109:2 (Heiland).

- Walters Sale 6 (319 Herr Street)

95.     Walters Sale 6 does not compare to the Subject Properties even though, at its date of sale, the property was improved with an 18-space parking lot.  Vol. II, Tr. 41:7-8 (Walters).  The property's 0.14-acre size is a tiny fraction (8%) of the 1.765-acre size of 634 Reily Street.  Stip. Fact Nos. 12, 37.  The property would not be a substitute for the Subject Properties and should not be used to value them.

96.     The Sale 6 property otherwise does not provide a reliable basis for valuing the Subject Properties.  Vol. II, Tr. 158:15-18 (Walters) ("It's not an identical comp, but it is an indicator of land value in the City of Harrisburg.").  The property sold in February 2009, more than nine years prior to the Date of Value, and is located in a more developed area of midtown.  *Id.*, Tr.

158:2-6; Vol. III, Tr. 109:6-9, 109:15-20 (Heiland).

- Walters Sale 7 (Susquehanna Street Properties)

97.    Walters Sale 7 involved the purchase of three different land lots from two different owners, for a total selling price of $325,000.  Stip. Fact No. 38; Vol. II, Tr. 41:20-42:10 (Walters); Vol. III, Tr. 109:24-110:3 (Heiland).  These lots, totaling 0.37 acres, then were assembled for a parking lot.  Stip. Fact No. 38; Vol. III, Tr. 110:6-7 (Heiland).

98.    The Sale 7 assemblage does not compare to the Subject Properties.  The properties sold on different dates (September 2007, January 2008, March 2008), but all in all about a decade prior to the Date of Value.  Stip. Fact No. 38.  Vol. II, Tr. 159:13-17 (Walters); Vol. III, Tr. 110:8-15 (Heiland).

99.    In addition, the Sale 7 assemblage is located in a more developed area of midtown. Vol. II, Tr. 158:20-159:5 (Walters); Vol. III, Tr. 110:4-5, 110:17-25 (Heiland).  Further, the property's size is 0.37 acres, much smaller than the Subject Properties.  Stip. Fact Nos. 12 and 38.

- Walters Sale 8 (Corner of Second Street and Front Street)

100.    The Sale 8 property does not compare to the Subject Properties.  As set forth above, the Sale 8 Property enjoys perhaps the best location in all of Harrisburg, on the corner of Second and Front Streets, and sold at the peak of the market in 2007 with approvals already in place for a 14 story hotel.  *See supra* at ¶¶ 75(b).  Mr. Walters agreed that the Sale 8 property is in a "different market" than the Subject Properties.  Vol. II, Tr. 133:10-15 (Walters) ("Q. So you agree that Sale 8 would be a different market than the subject property; right?  A. Yes.  Q. The two properties would likely have different buyers; correct?  A. Yes.").

- Walters Sale 9 (1501 Green Street)

101.    Walters Sale 9 does not compare to the Subject Properties even though the property was purchased for parking.  Vol. II, Tr. 52:13-14 (Walters).  The property sold in November 2006, more than 11 years prior to the Date of Value.  Stip. Fact No. 40.

102.    In addition, the Sale 9 property is located in a more developed area of midtown.  Vol. II, Tr. 160:22-161:4, 161:16-20 (Walters); Vol. III, Tr. 112:20-22, 113:2-11 (Heiland).  Further, the property's size is 0.28 acres, much smaller than the Subject Properties.  Stip. Fact Nos. 12 and 40; Vol. III, Tr. 112:19 (Heiland).

- Walters Sale 10 (Seedy Motel)

103.    Walters Sale 10 also does not compare to the Subject Properties and does not provide a reliable basis for determining value.

104.    The Sale 10 property sold in September 2006, more than 11 years prior to the Date of Value.  Stip. Fact No. 41; Vol. II, Tr. 162:21-25 (Walters); Vol. III, Tr. 113:16-20 (Heiland) ("Q. Again, why is this sale in 2006 notable to you, as an appraiser?  A. It's beyond a reasonable limit of time.  The market conditions changed considerably.  2006 was still a very strong market.").

105.    At the time of sale, the property was improved with a seedy motel that rented rooms by the hour.  Vol. II, Tr. 163:4-5 (Walters); Vol. I, Tr. 68:20-21 (Brinjac) ("Q. And you agree that it was a fleabag seedy motel; correct?  A. Yes.").  The Bethesda Mission, a Christian-based homeless shelter and the adjacent property owner, purchased the motel to end the on-site open prostitution.  Vol. II, Tr. 163:10-18 (Walters) ("Q. You would agree that open prostitution was inconsistent with the objectives of the Bethesda Mission; correct?  A. Yes, it is.  Q. And it's your understanding that Bethesda Mission purchased this property in an effort to clean up the neighborhood; correct?  A. They had just spent $10 million on their brand new – on the building; and, yeah, it was a bad idea to have that next to them.").  Bethesda Mission paid for a building,

not land, in order to rid itself of the nuisance property next door. Vol. II, Tr. 163:22-164:5 (Walters) ("Q. Bethesda Mission had to pay the number that the motel owner wanted for the property; right? A. Ready, willing and able seller/ready, willing and able buyer. Yeah, that's pretty much what happened…. Q. So Bethesda Mission had to pay for the building, not just land; right? A. Essentially, yes."); *id.*, Tr. 164:9-14 ("Q. You think Bethesda Mission could have paid a premium in order to rid this nuisance property from the neighborhood; correct? A. It wouldn't surprise me, but I wasn't involved with their buying decisions."); Vol. III, Tr. 114:19-22 (Heiland) ("A buyer like this may overpay for a property because they are highly motivated. In fact, our confirmation of information from this property suggested that [Bethesda Mission] felt that they did overpay for this property.").

- Walters Sale 11 (326 Market Street)

106. The 0.76-acre Sale 11 property sold in May 2005 for $4 million, or $5.2 million per acre. Ex. D-15 (Walters Rep.) at unnumbered page discussing Sale 11. Mr. Walters excluded this sale in determining his price per acre. *Id.* at pg. 52 (price per acre check for reasonableness "eliminat[ed] the two highest and two lowest adjusted unit rates").

107. Mr. Walters properly excluded the Sale 11 property in determining his price per acre value. *Inter alia*, the Sale 11 property is located in the heart of downtown, in a vastly superior location. *See supra* at ¶ 73. In addition, the property sold about 13 years prior to the Date of Value. Stip. Fact No. 42. Such dated sales do not provide a reliable basis for determining value. Vol. III, Tr. 88:14-21, 115:3-4 (Heiland).

*The Government's Valuation*

   *The Government's Proposed Highest and Best Use*

108. The Government presented independent expert appraiser Gary Heiland, who

separately valued each of the Subject Properties.

109. The parties have stipulated to Mr. Heiland's valuations of the 644 Boyd Street and the 1519 North Sixth Street parcels (assuming the Subject Properties should be valued separately). Stip. Fact No. 59. Mr. Heiland valued the 644 Boyd Street parcel at $10,000 and the 1519 North Sixth Street parcel at $20,000. *Id.*

110. Mr. Heiland valued the 634 Reily Street parcel at $1,300,000. Vol. III, Tr. 11:1-3. Mr. Heiland's opinion of the market value of the Subject Properties accordingly is $1,330,000.

111. Mr. Heiland determined that the highest and best use of the 634 Reily Street parcel at the Date of Value was continued use as a parking lot. To make this determination, Mr. Heiland analyzed recent sales of land and parking lots in the City of Harrisburg. In particular, Mr. Heiland analyzed whether similar parking lot properties in Harrisburg sell for more than vacant land. Vol. III, Tr. 13:19-14:2 (Heiland) ("I looked at the value of the property as a parking lot and the value of the land as development land, and the value as a parking lot was higher.").

112. Mr. Heiland's analysis established that comparable parking lots sell for more than comparable development land. Vol. III, Tr. 34:20-35:6 (Heiland) ("[T]here is a higher value achieved in the continued use of the property as a parking lot versus redeveloping the property in some way.").

113. Mr. Heiland explained that other data points support this conclusion. For example, 634 Reily Street was used as a parking lot as of the Date of Value and for many years prior. Vol. III, Tr. 26:11-21 (explaining that RSA's use of 634 Reily Street as a parking lot was "evidence of what the property owner believes the highest and best use is because of how it's in operation").

114. Further, there is a robust market for parking in the City of Harrisburg. As a result of the so-called "incinerator debacle," the City of Harrisburg cannot create new parking and has

removed parking as a permitted use in areas zoned Downtown Center, which created "a situation where parking is at a premium, and it's highly demanded." Vol. III, Tr. 25:22-26:9 (Heiland). This strong demand for parking included the midtown neighborhood. *Id.*, Tr. 25:17-21; Vol. I, Tr. 66:3-9 (Brinjac) (RSA paved a parking lot after purchasing 634 Reily Street because it believed there would always be demand for parking).

115.    This contrasts with the bleak market for new office space. Mr. Heiland considered the demand for new office development, including from institutional-type users, but concluded that there was no demand to construct a new office building at the Date of Value. Vol. III, Tr. 34:9-11 ("[T]here is limited demand [for office space] and there is no demand for 357,000 or 400,000 square feet of office [at 634 Reily Street]."); *id.*, Tr. 26:22-27:11 (explaining that "there's very little office in midtown" and the only "recent" office building, constructed in 2009 or 2010, is 75,000 square feet in size, located in the heart of midtown, and, at the Date of Value, had "40,000 to 50,000 square feet still available" to lease).

### *Mr. Heiland's Methodology*

116.    Mr. Heiland valued 634 Reily Street as a parking lot using the cost approach, sales comparison approach, and income approach. Vol. III, Tr. 36:2-5 (Heiland). He ultimately determined that the market value of 634 Reily Street was $1,300,000 as of the Date of Value. *Id.*, Tr. 11:1-3 (Heiland).

117.    Mr. Heiland determined his final value of $1,300,000 by assigning roughly equal weight to his cost approach valuation ($1,320,000) and his sales comparison approach valuation ($1,270,000). Ex. P-21 (Heiland Rep.) at US-MVG-0003904; Vol. III, Tr. 72:7-73:12 (making a correction to his report, bringing the number up from $1,310,000 to $1,320,000); Vol. III, Tr. 94:23-24 (Heiland) ("[M]y primary approach to value is the cost approach and the sales

comparison approach."). Mr. Heiland's "test of reasonableness" income approach valuation validated the accuracy of the cost and sales comparison valuations. Vol. III, Tr. 94:19-95:1 (Heiland); Ex. P-21 (Heiland Rep.) at US-MVG-0003910 (noting that the income approach valuation "is considered to be more subjective [than other approaches] due to difficulties in projecting market rental rates, occupancy rates, expenses and capitalization rates . . .").

118.    In the cost approach, Mr. Heiland identified comparable sales of vacant land to develop a unit of comparison based on price per square foot of land area. This provided a value of the property as unimproved. Mr. Heiland then added the contributory value of the parking lot improvements. Vol. III, Tr. 36:6-15 (Heiland).

119.    In the sales comparison approach, Mr. Heiland identified comparable sales of parking lots to develop a unit of comparison based on price per parking space. He multiplied his price per parking space by the 232 parking spaces at 634 Reily Street to value it as improved. Vol. III, Tr. 36:16-21, 41:6-15, 90:24-25 (Heiland).

120.    Mr. Heiland used comparable sales for his analysis under both the cost approach and the sales comparison approach. Vol. III, Tr. 36:22-24 (Heiland).

121.    In both the cost approach and sales comparison approach, Mr. Heiland searched for sales with similar attributes to 634 Reily Street, including with respect to location, size, and the proximity in time of the sale to the Date of Value. These similarities are important given the principle of substitution undergirding the sales-comparison analysis, which "generally holds that a buyer won't pay more for one property than they would for a substitute property." Vol. III, Tr. 37:2-4, 37:13-38:21 (Heiland).

122.    Finally, as a test for reasonableness, Mr. Heiland valued 634 Reily Street based on its income-generating potential as a 232-space parking lot. Vol. III, Tr. 91:9-18, 94:15-18

(Heiland).

*Mr. Heiland's Cost Approach Valuation*

123.    For his cost approach valuation, Mr. Heiland identified four comparable land sales. He compared these sales to the 634 Reily Street parcel based on price per square foot of land area.  Vol. III, Tr. 39:11-13 (Heiland).  Mr. Heiland selected this unit of comparison because that is "how the market analyzes, discusses, markets land."[13]  *Id.*, Tr. 39:14-17.

- Heiland Land Sale 1

124.    Heiland Land Sale 1 is the contracted sale of 0.83 acres (35,981 square feet) located at 645 Maclay Street, north of 634 Reily Street in the midtown neighborhood, close to the railroad corridor.  Stip. Fact No. 46; Vol. III, Tr. 43:18-44:2 (Heiland).

125.    Land Sale 1 was marketed for development.  Marketing materials describe the property's location near the "Northern Gateway" and its Commercial General zoning designation that would allow the site to be 95% usable.  Ex. P-43 (marketing brochure); Vol. III, Tr. 45:22-47:2 (Heiland).

126.    The property was under contract in March 2018, close in time to the Date of Value. Stip. Fact No. 46.  The contract price was slightly below the asking price of $670,000, or

---

[13] Mr. Nalbandian testified that developers are concerned about whether a site can accommodate the size of their project.  Vol. III, Tr. 204:12-16 (Nalbandian).  This undoubtedly is true but says nothing about how buyers and sellers price land.  Mr. Nalbandian appeared to concede as much. *Id.*, Tr. 204:21-23 ("Q. Do they use that [buildable area] in negotiating purchase price as well? A. It depends on the developer.  It depends on the seller.  There is always some room for negotiation.").  When asked whether the market demands that developers pay based on maximum buildable area, even if they are not building to maximum scale, Mr. Nalbandian answered "[developers] want to pay [based on maximum buildable area] because they want to be successful," but offered no market support for this conclusion.  *Id.*, Tr. 204:6-11.

$18.60/square foot.  Vol. III, Tr. 48:7-10 (Heiland)[14]; Ex. P-21 (Heiland Rep.) at US-MVG-0003868.  The buyer purchased the property for an approximately 6,800 square foot AutoZone retail store that is not the maximally sized, by-right structure that can be built on the property.  Vol. III, Tr. 47:12-18 (Heiland).

127.    Land Sale 1 provides a reliable basis for valuing 634 Reily Street given its location just a few blocks away in midtown, near the railroad tracks, as well as its contract date close in time to the Date of Value, its topography/physical conditions, its access to utilities, and its Commercial General zoning designation.[15]  Vol. III, Tr. 48:12-15 (Heiland), Ex. P-21 (Heiland Rep.) at US-MVG-0003883.  However, on a unit basis, Sale 1 overall is superior to 634 Reily Street, principally because of its smaller size (0.83 acres).  Vol. III, Tr. 49:7-13, 51:10-19 (Heiland).  Mr. Heiland also found that Sale 1 was mildly superior for conditions of sale and mildly inferior for approvals.  Vol. III, Tr. 49:2-5, 49:14-51:10 (Heiland).  These two adjustments essentially offset each other.  With respect to his adjustment for approvals, Mr. Heiland considered the 634 Reily Street parcel's status as approved for the existing use as a parking lot compared to the approval status of the vacant land parcels.  In general, he found that for sales where there were contingencies for the buyer to obtain approvals, that attribute was mildly inferior to the approved parking lot status of 634 Reily Street, and for sales where the property sold without any approvals, that attribute was inferior to the approved parking lot status

---

[14] Mr. Heiland testified that the sale had not closed as of the date of his report, but that he felt comfortable using the transaction because his "confirmation sources indicated that the price—the ultimate price was going to be slightly below the asking price."  Vol. III, Tr. 48:4-10.

[15] Mr. Heiland applied the Commercial General zoning designation to 634 Reily Street in order to disregard any potential project influence from the federal courthouse project.  *See infra* at ¶ 238.

of 634 Reily Street. *Id.*, Tr. 49:22-51:7.

128.    Land Sale 1 accordingly supports valuing 634 Reily Street, as unimproved, at a price per square foot of less than $18.60.  Vol. III, Tr. 51:10-19 (Heiland).

- Heiland Land Sale 2

129.    Heiland Land Sale 2 is located directly across Seventh Street from the subject, has an almost identical size (1.64 acres, or 71,439 square feet) and transacted in May 2018, essentially contemporaneous with the Date of Value.  Stip. Fact No. 47; Vol. III, Tr. 52:8-10 (Heiland). Land Sale 2 sold for $425,000, less than its $450,000 asking price, for a unit rate of $5.90 per square foot of land area.  Stip. Fact No. 47; Vol. III, Tr. 56:15-17 (Heiland).

130.    Land Sale 2 was marketed for its development potential, including commercial office, residential, and industrial.  Vol. III, Tr. 52:18-19, 53:2-7 (Heiland); Ex. P-44 (marketing brochure) at US-MVG-0000265.  Notwithstanding its development potential, marketing materials advertised a price per acre, not a price per square foot of buildable area.  Vol. III, Tr. 53:10-13 (Heiland); Ex. P-44 (marketing brochure) at US-MVG-0000266.

131.    Land Sale 2 is zoned industrial, which, like the Commercial General designation, allows for construction of an office building or a parking lot.  Vol. III, Tr. 55:16-23 (Heiland). However, the Commercial General designation limits building height to 100 feet, whereas the industrial designation has no height limit.  *Id.*, Tr. 55:24-56:1; Ex. D-13 (Zoning Code) at RSA0001937-1938.

132.    The buyer purchased Land Sale 2 as a speculative investment. Vol. III, Tr. 56:5 (Heiland).  The buyer reported that he knew of the federal courthouse project but that the courthouse project was not a driving factor in the purchase.  *Id.*, Tr. 56:5-10.  However, if the federal courthouse project did influence the sale, it would have increased the value (rather than

depress the sale price). *Id.*, Tr. 56:11-14; Vol. II, Tr. 108:2-6 (Walters) (explaining that the courthouse project will have a "positive impact on the neighborhood"). Of note, Land Sale 2 sold for less than the asking price. Vol. III, Tr. 56:15-17 (Heiland).

133. In its rebuttal case, RSA put forward testimony from Mr. Snyder and Mr. Walters that the development potential of Land Sale 2 is limited by its rectangular shape and that Mr. Heiland should not have used it as a comparable sale. Vol. III, Tr. 181:13-24 (Snyder); Vol. IV, Tr. 7:7-25 (Walters). The evidence established that Land Sale 2 has substantial development potential and that Mr. Heiland properly selected the property as a comparable sale. For example:

    a. Land Sale 2 has a width of 125 feet. Ex. P-71 (Deed) (describing width of 125 feet); Vol. III, Tr. 54:4-5 (Heiland); Vol. IV, Tr. 23:7-18 (Walters).

    b. Land Sale 2 previously was improved with a 50,000 square foot industrial building. Ex. P-72 (Costar Listing); Vol. IV, Tr. 25:12-21 (Walters). Mr. Snyder's opinion that Heiland Comparable Land Sale 2 would only support approximately 20,000 square feet of office space is not credible because his analysis was only a "quick assessment" and he did not prepare a conceptual site plan for the site, analyze the maximum height building the site could support, analyze whether there was a layout for the site that would allow underground parking, consider whether a variance would allow larger development, or consider the 50,000 square foot building that previously existed at the property. Vol. III, Tr. 180:22-25, 189:17-190:25 (Snyder).

    c. The nearby Department of Labor building was built on a site approximately 85 or 86 feet wide, substantially less than 125 feet. Vol. III, Tr. 54:19-55:4, 55:11-12 (Heiland); Vol. IV, Tr. 24:8-22 (Walters). Parking garages also exist in

Harrisburg on properties that are less than 125 feet wide. Vol. III, Tr. 55:12-14 (Heiland).

    d.  The industrial zoning designation has no height limitation. Ex. D-13 at RSA0001938.

134.   Land Sale 2 demonstrates that the land value of 634 Reily Street should be greater than $5.90/square foot. The property overall is inferior to 634 Reily Street notwithstanding its similar location, size, and date of sale. Vol. III, Tr. 57:9-12 (Heiland). In particular, Land Sale 2 lacked approvals for parking and, although the industrial zoning designation has no height limitation, the industrial zoning designation is more restrictive in other respects, including for impervious coverage and setbacks. *Id.*, Tr. 57:2-9.

- <u>Heiland Land Sale 3</u>

135.   Heiland Land Sale 3 is the August 2016 sale of 17 parcels of property located at or near 1633 N. Sixth Street in Harrisburg having a total area of 1.90 acres (82,766 square feet). Stip. Fact No. 48. The property is located in the same immediate neighborhood as 634 Reily Street, within two blocks, and sold for $1,011,600, or $12.22 per square foot of land. Vol. III, Tr. 57:14-20, 63:13-18 (Heiland).

136.   The 17 parcels are all in close proximity, but not entirely contiguous. Vol. III, Tr. 132:7-9 (Heiland); Ex. P-21 at US-MVG-0003874 (map depicting parcels).

137.   The buyer was the Commonwealth of Pennsylvania, whose intended use for the property is as part of an assemblage for the new State Archives building. Vol. III, Tr. 57:22-58:1 (Heiland). The seller (entities affiliated with the Vartan Group) responded to a request for proposal that the Commonwealth issued. *Id.*, Tr. 58:25-59:1. Prior to selecting the 1633 N. Sixth Street site, the State considered locating the State Archives in Susquehanna Township. *Id.*,

Tr. 30:16-21.

138.    Mr. Heiland personally confirmed the sale with both the buyer (Commonwealth of Pennsylvania) and the seller (entities affiliated with the Vartan Group). Both parties confirmed that the price paid was market and that it was a market-oriented transaction. Vol. III, Tr. 58:2-22 (Heiland). The property did not sell under threat of condemnation. *Id.*, Tr. 58:23-59:1.[16]

139.    Mr. Heiland took other steps to verify the transaction was market-oriented given that the buyer was the Commonwealth. For example, Mr. Heiland personally met the Commonwealth representative who negotiated the purchase and requested his entire file.[17] Vol. III, Tr. 58:10-15, 136:2-4 (Heiland). He analyzed all of the available underlying documentation for the transaction, including deeds, settlement statements, and appraisals that were obtained by the seller for the buyer. *Id.*, Tr. 59:2-13, 64:17-22.[18]

140.    Mr. Greg Rothman, MAI, a local real estate appraiser, previously had valued the 17 parcels. Vol. III, Tr. 61:5-10 (Heiland). The Vartan Group hired Mr. Rothman, and Mr. Rothman valued the 17 parcels individually or in small groups, not collectively. *Id.*, Tr. 64:2-4.

---

[16] While the sale of the 17 parcels may have benefitted other property owned by the Vartan Group, Mr. Heiland's investigation confirmed that the price paid was market value. Vol. III, Tr. 58:2-22, 170:14-171:2 (Heiland) ("Mr. Vartan has been trying to sell parcels and develop parcels in this neighborhood for a long time. This is the largest project that he's been able to [attract] to the neighborhood. It's my opinion that the price that he sold the property for is reflective of that fact. It's the first one that he's gotten to be able to do, and that reflects market value.").

[17] Mr. Heiland requested but was unable to obtain certain documentation described in the Yellow Book as part of the extraordinary verification process for sales to a government entity, such as an agency review of the appraisals and a negotiator's report. Vol. III, Tr. 135:16-136:8 (Heiland).

[18] He also obtained information about the remainder of the property that was assembled for the State Archives that was not owned by the Vartan Group. Mr. Heiland did not use the remainder of the assembled property as part of his Comparable Land Sale 3, because the additional parcels were much smaller parcels of land and transferred in separately negotiated transactions, which may have been under threat of condemnation. Vol. III, Tr. 59:17-24 (Heiland).

Mr. Rothman's appraisals utilize price per square foot of land as the unit of comparison, not price per square foot of buildable area. *Id.*, Tr. 61:17-23. The combined total of Mr. Rothman's independent appraisals equaled $1,434,000, or $17.33 per square foot of land. *Id.*, Tr. 63:4-12. Mr. Rothman's comparable sales ranged from $11.61 to $20.13 per square foot of land area. *Id.*, Tr. 62:2-4.

141. Mr. Heiland explained that it was unsurprising that the sum total of Mr. Rothman's appraisals exceeded the bargained-for purchase price of $1,011,600 given that Mr. Rothman did not appraise the 17 parcels as one larger, 1.90-acre parcel. Smaller parcels sell for a higher unit price due to economies of scale. One accordingly would expect the sum total of Mr. Rothman's appraisals to exceed the price paid for the 1.9 acres collectively. Vol. III, Tr. 64:1-8 (Heiland). Moreover, the actual price paid on a unit basis ($12.22 per square foot of land) was within the range of unit values of Mr. Rothman's comparable sales ($11.61 to $20.13 per square foot of land). *Id.*, Tr. 62:2-4, 63:13-18, 63:23-64:12.

142. Land Sale 3 demonstrates that 634 Reily Street, as unimproved, likely would sell for some amount more than $12.20 per square foot. Vol. III, Tr. 66:5-7 (Heiland). The property shares a similar location in the immediate neighborhood to 634 Reily Street, and sold relatively close in time to the Date of Value (in August 2016), but lacked any approval for parking at its sale date. *Id.*, Tr. 65:19-66:5.

- Heiland Land Sale 4

143. Heiland Land Sale 4 is the June 2016 sale of 851 South 19th Street. The Sale 4 property has an area of 1.45 acres (62,829 square feet) and sold for $250,000, or $3.98 per square foot of land. Stip. Fact No. 49; Vol. III, Tr. 69:13-15 (Heiland).

144. Land Sale 4 is located in the City of Harrisburg south of the downtown neighborhood,

near Interstate 83.  This location has similarities to midtown Harrisburg: the area has older

rowhouses, industrial buildings, and scattered convenience commercial-type uses.  Vol. III, Tr.

67:11-68:2 (Heiland).

145.    The buyer purchased Land Sale 4 to develop a senior daycare facility. Vol. III, Tr.

68:12-14 (Heiland).  While the buyer ultimately acquired additional property to develop the

facility, it was a separately negotiated transaction.  *Id*., Tr. 68:15-23.  Land Sale 4 was a

developable site by itself.  *Id*., Tr. 69:10-12.

146.    Land Sale 4 indicates that the land value of 634 Reily Street should be greater than

$3.98 per square foot of land.  Vol. III, Tr. 69:13-15, 70:3-6 (Heiland).  The property has a

similar size to 634 Reily Street, has the same zoning designation (Commercial General), and sold

in June 2016, close in time to the Date of Value.  But, overall, Land Sale 4 is inferior to 634

Reily Street because of its less desirable location and lack of approval for parking.  *Id*., Tr.

68:25-70:2.

*    *    *

147.    Mr. Heiland's four land sales established that 634 Reily Street, as unimproved land,

would sell for between $12.20 and $18.60 per square foot of land area.  Vol. III, Tr. 70:16-24

(Heiland).  Mr. Heiland concluded a final unit rate of $15.40.  *Id.*, Tr. 70:24-71:1.  This resulted

in a value of $1,180,000 (76,864 sq. ft. x $15.40/sq. ft. = $1,183,706).  Ex. P-21 (Heiland Rep.)

at US-MVG-0003884.

148.    Mr. Heiland then determined the contributory value of the parking lot improvements at

634 Reily Street.  First, Mr. Heiland calculated a total replacement cost for the parking lot

(including entrepreneurial incentive); the replacement cost totaled $477,398.  Vol. III, Tr. 72:1-5,

72:15-17 (noting correction to report) (Heiland); Ex. P-21.1; Ex. P-21 at US-MVG-0003885.

Mr. Heiland then depreciated this replacement cost, to account for the age and condition of the existing pavement at the Date of Value. Mr. Heiland determined that the parking lot improvements at 634 Reily Street contributed $143,219 in additional value. Vol. III, Tr. 72:18-24 (Heiland); Ex. P-21.1.

149.     Mr. Heiland's cost approach accordingly indicated a value for 634 Reily Street at the Date of Value of $1,320,000 (rounded). Vol. III, Tr. 72:22-73:4, 73:14-19 (Heiland).

### *Mr. Heiland's Sales Comparison Approach Valuation*

150.     Mr. Heiland separately determined the market value of 634 Reily Street as improved with a parking lot using the sales-comparison approach. As part of his sales comparison approach, Mr. Heiland identified four comparable parking lot sales in the City of Harrisburg.

151.     Mr. Heiland used a unit of comparison of price per parking space in his sales comparison approach. Buyers and sellers analyze parking lot properties based on this unit of comparison. Vol. III, Tr. 41:6-15 (Heiland); Vol. II, Tr. 176:19-21 (Mr. Walters used a price per parking space in his 2016 appraisal).

- Heiland Parking Lot Sale 1

152.     Heiland Parking Lot Sale 1 is the sale of the parking lot located at 27-31 North 10th Street. The property is 0.50 acres in size and, at the time of sale, was improved with an 82-space parking lot. The property sold in December 2018 for $450,000, or $5,488 per parking space. Stip. Fact No. 50; Vol. III, Tr. 76:3-5 (Heiland).

153.     The buyer purchased the property for continued use as a parking lot. Vol. III, Tr. 75:15-17 (Heiland). The property is zoned downtown center, which would allow for office and other development. *Id.*, Tr. 75:18-76:2.

154.     Mr. Heiland determined that Parking Lot Sale 1, overall, is very comparable to 634

Reily Street. The property is located within walking distance of the downtown core of Harrisburg; however, for parking, the property's location is mildly inferior to 634 Reily Street because it must compete against a nearby large parking facility known as Transitpark. Vol. III, Tr. 77:2-78:10 (Heiland). The property also has more development challenges than 634 Reily Street because of its location in the flood zone. *Id.*, Tr. 78:18-21. Counterbalancing these inferior attributes are the property's smaller size (on a unit basis, smaller parking lots sell for more than larger parking lots) and conditions of sale. *Id.*, Tr. 76:23-77:2, 78:12-18. A neighboring property owner purchased the Sale 1 Parking Lot, and such buyers commonly are motivated to pay more than market value. *Id.*, Tr. 76:23-77:2.

155.    Overall, the superior and inferior characteristics offset, demonstrating that, on per parking space basis, 634 Reily Street would have a similar value to Parking Lot Sale 1 ($5,490 per parking space). Vol. III, Tr. 78:22-25 (Heiland).

- Heiland Parking Lot Sale 2

156.    Heiland Parking Lot Sale 2 is the sale of the 100-space parking lot located at 222 Chestnut Street, in the heart of downtown Harrisburg. The 0.54-acre property sold in October 2018 at a price of $2,450,000. Stip. Fact No. 51. Parking Lot Sale 2 is a portion of Mr. Walters's Sale 1. *See supra* at ¶¶ 67(b), 72(a), 75(a). Mr. Heiland testified that the buyer, Harrisburg University, purchased the property for development, but that he included this sale as a parking lot sale because he believes the sale reflects the property's value as a parking lot because of the limited demand for development in Harrisburg and his opinion that a typical buyer would not have built on this site at that time. Vol. III, Tr. 80:19-81:10 (Heiland).

157.    Mr. Heiland included Parking Lot Sale 2 in his analysis only because of the paucity of recent parking lot sales in the City of Harrisburg. Vol. III, Tr. 80:6-12 (Heiland). According

to Mr. Heiland, Parking Lot Sale 2 is "a massive outlier" because of its vastly superior location and merely brackets the high end of the market for parking lots. Vol. III, Tr. 80:6-12, 81:11-17 (Heiland); *id.*, Tr. 79:7-18 (explaining that "[p]arking is at an absolute premium" downtown); Vol. II, Tr. 145:3-7 (Walters) (agreeing that it would be "ridiculous" to value 634 Reily Street based on the price per acre implied by the sale of the 222 Chestnut property).

158.    Parking Lot Sale 2 is highly superior to 634 Reily Street and establishes that 634 Reily Street would sell for far less than $24,500 per parking space. Vol. III, Tr. 83:15-24 (Heiland).

- Heiland Parking Lot Sale 3

159.    Heiland Parking Lot Sale 3 is the July 2018 sale of a 40-space parking lot located at 217 Forster Street and 222 Briggs Street. The 0.22-acre property sold for $525,000, or $13,125 per parking space. Stip. Fact No. 52; Vol. III, Tr. 86:4-6 (Heiland). The buyer purchased Parking Lot Sale 3 for continued use as a parking lot. Vol. III, Tr. 85:13-15 (Heiland).

160.    Parking Lot Sale 3 enjoys a vastly superior location compared to 634 Reily Street. The property is located along Forster Street on the northern edge of the downtown Harrisburg neighborhood, in a densely developed area with residential and service-oriented commercial uses. Vol. III, Tr. 84:20-22, 85:5-6, 87:3 (Heiland). Reflecting its superior location, the property's parking spaces were leased at $110/month at the time of its sale. *Id.*, Tr. 85:16-18. The property also is highly superior to 634 Reily Street in terms of its size (40 parking spaces versus 232 parking spaces). *Id.*, Tr. 87:4-8.

161.    Parking Lot Sale 3 is highly superior to 634 Reily Street and establishes that 634 Reily Street would sell for less than $13,130 per parking space. Vol. III, Tr. 87:11-14 (Heiland).

- Heiland Parking Lot Sale 4

162.     Heiland Parking Lot Sale 4 is the sale of an approximately 130-space parking lot located at 829 and 1001 Market Street.  The 1.12-acre property sold in September 2013 for $500,000, or $3,846 per parking space.  Stip. Fact Nos. 35 and 52; Vol. III, Tr. 89:12-14 (Heiland).  Mr. Walters also identified Parking Lot Sale 4 as a comparable transaction; the property is Walters Sale 4.  Stip. Fact No. 53.

163.     Parking Lot Sale 4 is close to Parking Lot Sale 1: within walking distance to the core of downtown Harrisburg but next to the Transitpark facility.  Vol. III, Tr. 87:17-88:2 (Heiland). The sale occurred prior to the city's rezoning in 2014; at that time, the property was zoned light industry, which allowed many uses including parking and office uses.  *Id.*, Tr. 89:1-11.

164.     Parking Lot Sale 4 indicates that 634 Reily Street would sell for more than $3,846 per parking space because of its overall inferior characteristics.  Vol. III, Tr. 90:7-9 (Heiland).  The inferior characteristics include its 2013 sale date, when the market was not as strong, and its location in the flood zone.  *Id.*, Tr. 89:24-90:3.

*     *     *

165.     Mr. Heiland's four parking lot sales establish that 634 Reily Street would have sold for less than $24,500 per space and less than $13,130 per space, but that it is worth more than $3,850 per space at the Date of Value.  Vol. III, Tr. 90:16-24 (Heiland).  Mr. Heiland concluded a final unit rate of $5,490 per parking space, the same unit rate as Parking Lot Sale 1.  *Id.*, Tr. 90:20-23.  Parking Lot Sale 1 compared similarly to 634 Reily Street after making qualitative adjustments.  *Id.*

166.     The unit rate of $5,490 per parking space resulted in a value conclusion of $1,270,000 ($5,490/parking space x 232 parking spaces = $1,273,680).  Vol. III, Tr. 90:12-91:4 (Heiland).

_Mr. Heiland's Income Approach Valuation_

167.    As a test of reasonableness, Mr. Heiland separately performed an income approach valuation.  The income approach indicated a market value of 634 Reily Street, as improved as a parking lot, of $1,350,000.  Vol. III, Tr. 94:15-95:1 (Heiland).

168.    Prior to the Date of Value, 634 Reily Street was an income-producing, 232-space parking lot in fair condition.  Stip. Fact No. 14; Vol. I., Tr. 179:4-13 (Walters); Vol. III, Tr. 165:4-9 (Heiland).  All agree that the parking lot enjoyed strong demand prior to the announcement of the federal courthouse project.  Vol. III, Tr. 92:1-5 (Heiland); Vol. I, Tr. 42:12-17, 49:9-17 (Brinjac).  Customers included PHEAA, who leased 150 spaces from the operator (PRK-MOR).  Vol. I, Tr. 166:17-22 (Walters); Ex. P-21 (Heiland Rep.) at US-MVG-0003823.  But parking income dropped dramatically after announcement of the courthouse project, as parking customers pursued other options (in the case of PHEAA, purchasing the Bertolino Building and tearing it down for parking).  Stip. Fact No. 21; Vol. I, Tr. 49:9-25 (Brinjac); Vol. II, Tr. 150:13-17 (Walters).

169.    Mr. Heiland determined that, but for the courthouse project, the strong demand for parking at 634 Reily Street would have continued.  Disregarding the project influence, Mr. Heiland determined that a parking operator could charge $80 per month per parking space at the Date of Value (substantially more than the actual $55 per month that PRK-MOR charged, _see_ Stip. Fact No. 19).  Vol. III, Tr. 93:3-5.  Mr. Heiland determined the $80 rental rate based on the change in rates at competitive parking lots from 2010 through the Date of Value.  Ex. P-21 (Heiland Rep.) at US-MVG-0003906; Vol. III, Tr. 92:12-93:5 (Heiland) (_e.g._ monthly rent for parking spaces in the downtown Mulberry Street parking lot went from $85 in the 2009-2010 time frame to $120 at the Date of Value).  This rental rate produces an annual effective gross income of $213,700, which accounts for both 1% other additional income and 5% vacancy and

collection losses. Ex. P-21 (Heiland Rep.) at US-MVG-0003911; Vol. III, Tr. 93:9-10 (Heiland). From the effective gross income, Mr. Heiland then subtracted expected operating expenses of $106,094.[19] This resulted in an expected net operating income, but for the courthouse project, of $107,606 at the Date of Value ($213,700 - $106,094 = $107,606). Ex. P-21 (Heiland Rep.) at US-MVG-0003911; Vol. III, Tr. 93:13-14 (Heiland).

170.    Mr. Heiland capitalized the expected net operating income at an 8% rate, resulting in a value estimate of $1,350,000 ($107,606 / 0.08 = $1,345,075). Vol. III, Tr. 94:1-5 (Heiland). An 8% capitalization rate accounts for the relative risk associated with obtaining parking rental income. Ex. P-21 (Heiland Rep.) at US-MVG-0003908-3910. Mr. Heiland determined an 8% capitalization rate was reasonable based upon real estate capitalization rate surveys, a band of investment technique, and one market transaction. *Id.*; Vol. III, Tr. 94:6-14, 171:6-10 (Heiland).

*The Market for Development of a 357,000+ Square Foot Building*

171.    The Landmark Market Watch report provides information on the office market for the City of Harrisburg and its suburbs. All of the real estate market expert witnesses in the case agreed that the Landmark Market Watch reports are used by market participants. Vol. III, Tr. 45:16-21(Heiland), 173:23-174:4 ("Every appraiser I know who does work in Harrisburg relies on those surveys. They are very reliable."); Vol. III, Tr. 223:13-23 (Nalbandian). Mr. Walters testified that he utilizes the information in the Landmark Market Watch reports in appraising properties and that "[a] wide array of market participants will look at [the Landmark] market reports." Vol. II, Tr. 99:1-8. Mr. Walters also testified in deposition that he would recommend

---

[19] Annual operating expenses include a 5% management fee, insurance, real estate taxes, utilities, maintenance/repairs, parking lot license, parking lot tax, and a 20% replacement reserve. Ex. P-21 (Heiland Rep.) at US-MVG-0003911; Vol. III, Tr. 93:17-23 (Heiland); Stip. Fact No. 21 (actual operating expenses of 634 Reily Street from 2005-2017).

Tommy Posavec if asked for a recommendation on a listing agent for a commercial office building in the City of Harrisburg. *Id*., Tr. 98:4-17. Mr. Posavec is the author of the Landmark Market Watch reports. *Id*., Tr. 98:18-21.

172. The Landmark Market Watch report reported negative office-space absorption in the City of Harrisburg for 2017, the year preceding the taking. Ex. P-14 at 2 ("2017 was a down year for the Downtown Business District as traction for Downtown properties just never stabilized. Absorption totaled negative 69,386 sq. ft. as businesses fell out of favor with Downtown and made a run for suburban properties.");[20] Vol. II, Tr. 101:10-12 (Walters).

173. For year-end 2017, demand for Class A office space "was hit particularly hard" and "[o]ccupancy rates closed the year down sharply at 90%." Ex. P-14 at 2.

174. The Landmark Market Watch report for first quarter 2018, which would have been issued close in time to the Date of Taking, showed an absorption of just 4,800 square feet of office space in the City. Ex. P-12 at 2; Vol. II, Tr. 102:8-10 (Walters). According to the Landmark Market Watch report: "Premier users have not been persuaded by the advantages of a Downtown address and are continuing to consider options outside city limits. Several law firms vacated the City limits in the last two years in favor of better availabilities, superior pricing and free on-site parking. With demand modest at best, incentives are necessary to stimulate activity before occupancy levels improve." Ex. P-12 at 2.

175. Office rents in the City of Harrisburg have been relatively flat over the past decade. Vol. III, Tr. 28:13-15 (Heiland).

176. The typical amount of office space leased by a commercial office tenant in the City of

---

[20] Mr. Walters confirmed that the "Downtown Business District" refers to the City of Harrisburg generally. Vol. II, Tr. 100:12-16 (Walters).

Harrisburg is under 20,000 square feet.  Vol. III, Tr. 35:23-25 (Heiland).

177.    The City of Harrisburg competes against suburban offerings of office space and that free parking and lower taxes are an advantage to locating in the suburbs.  Vol. II, Tr. 101:23-102:1, 106:14-20 (Walters); Vol. III, Tr. 28:3-12 (Heiland); Ex. P-14 (Landmark Market Watch report) at pg. 2 ("Suburban availabilities have persuaded several former Harrisburg tenants to relocate; offering excellent finishes, convenient free parking and mercantile tax-free environment.").

178.    In its efforts to attract new office tenants, the City of Harrisburg has been put at a competitive disadvantage as a result of the recent "incinerator debacle."  Vol. I, Tr. 165:11-14 (Walters) (the "incinerator debacle…hurt the larger perspective of what was going on in Harrisburg"); Vol. III, Tr. 17:4-12 (Heiland) ("It certainly impacted businesses' opinions of the city…. Q. Did it affect how the City of Harrisburg competes with neighboring suburban areas for new businesses?  A. Yes.").  The City accumulated hundreds of millions of dollars in debt to finance the incinerator and, when it failed to deliver anticipated revenue, the City was forced to sell its parking operations.  Vol. I, Tr. 165:11-16 (Walters); Vol. III, Tr. 16:13-17:3 (Heiland).

179.    Reflective of the stagnant market for new office space, the evidence indicated that just two new office buildings had been constructed in the City of Harrisburg in the 15 years prior to the Date of Value:  the Campus Square Building, a 75,000 square foot building in the heart of midtown, which has had occupancy problems (Vol. III, Tr. 27:2-11 (Heiland)), and the 54,239 square foot office building on the corner of Second and State Streets in downtown Harrisburg (Mr. Walters's Sale 8 property).  Vol. II, Tr. 125:4-126:7, 132:5-13 (Walters).

180.    In the immediate neighborhood, no office buildings have been built in recent years; instead, they have been demolished.  In 2014, PHEAA purchased and then tore down the

129,000 square foot Bertolino Building kitty-corner to the Subject Properties. Vol. II, Tr. 147:20-25 (Walters); Vol. III, Tr. 33:5-14 (Heiland).  The only large office buildings in the midtown neighborhood, PHEAA and the Labor and Industry Building, are not new developments.  Vol. III, Tr. 29:17-30:4 (Heiland) (The Labor and Industry Building, located on the southern edge of midtown near the Capitol Complex, is not new); *id.*, Tr. 30:8-12 (PHEAA's office building has existed since at least 1993); Vol. II, Tr. 91:5-6 (Walters) ("There is no offices being built in midtown.").

181.    Prior to the Date of Value, Verizon—a private office tenant—vacated office space in the so-called Verizon Tower causing "concern there would have been a problem in the core of Harrisburg."  Vol. II, Tr. 107:20-24 (Walters).  In response, the Department of General Services leased approximately 230,000 square feet of the former Verizon space, moving state employees from the State Hospital facility.  Vol. III, Tr. 28:25-29:16, 35:11-22 (Heiland).  This lease is the only new lease of more than 100,000 square feet of office space in the City of Harrisburg between 2010 and the Date of Value.  Vol. III, Tr. 35:11-16 (Heiland).

182.    Mr. Nalbandian testified that there was demand for office space in midtown, but used his own project as an example, which post-dates the Date of Value, and moreover, the evidence established that Mr. Nalbandian's project is being driven by the federal courthouse project.  *See supra* ¶ 58.

183.    Mr. Walters testified that an institution or a hospital might have been interested in the Subject Properties.  According to Mr. Walters, "hospital systems have a way of popping up out of nowhere."  Vol. I, Tr. 192:5-6.  But RSA put forward no testimony from institutional buyers; nor did it put forward any interviews, studies, or analyses demonstrating that any institutional buyer had demand for 357,000+ square feet of office space in midtown Harrisburg or the City of

Harrisburg more generally.

184.    Mr. Walters also acknowledged that he did not know when this so-called demand for hospital space could "eventually could pop up" (Vol. I, Tr. 192:10), and generally did not present any evidence as to when and how likely it would be that such an institutional buyer would show interest in 634 Reily Street.  Vol. II, Tr. 106:6-9 (Walters) ("Q. You don't have an opinion as to when a building would actually be constructed; right?  A. Again, it's a hypothetical question; and an institutional buyer could come out of nowhere, so it's an unknown.").

185.    Nor did Mr. Walters know whether an institutional buyer would need 357,000+ square feet of office space.  Vol. II, Tr. 97:22-98:3 (Walters) ("Q. You don't know whether a buyer, including this institutional buyer, would want to build the maximum size building permitted by the zoning code; correct?  A. They don't have to.  Q. You don't know whether they would; right?  It's hard to say?  A. It is hard to say.").

186.    Mr. Walters admitted that he previously described institutional buyers as "unicorns."  Vol. II, Tr. 105:4-7 (Walters).  Such buyers are unicorns because they are very few in number and it is a patience game waiting for one to materialize.  *Id*. at 104:23-105:3 ("Q. The scale of 400,000 square feet would remove nearly every buyer but for very few; correct?  A. Yes.  I agree with that.  Q. So you agree it's a patience game waiting for the right user?  A. Yes.").

187.    Mr. Walters cited four examples of institutional buyers acquiring land for new office space: Penn State Medicine, State Health, the Archives, and the Public School Employees' Retirement System (PSERS).  These examples, which do not appear in Mr. Walters's appraisal report, Ex. D-15, underscore the absence of demand for 357,000+ square feet of new office space in the City of Harrisburg.

        a.    Penn State Medicine purchased land in Cumberland County, demonstrating that

the suburbs can and do compete with the City of Harrisburg in attracting office users. Vol. II, Tr. 14:6-10 (Walters); Vol. III, Tr. 32:21-33:4 (Heiland).

b. State Health, which is in the process of vacating the State Hospital facility, intends to lease a yet-to-be constructed, 120,000 square foot building located on an 11-acre parcel of land in uptown Harrisburg, about one mile from the Subject Properties.[21] Vol. III, Tr. 30:25-31:17 (Heiland). The 120,000 square foot building is a fraction of the size of the hypothetical building proposed for 634 Reily Street and presumably is not the maximum-sized building that could be constructed on the 11-acre site.

c. The new State Archives building is not an office building but rather a storage facility with warehouse-like climate controlled spaces for records storage. Vol. IV, Tr. 21:23-22:3 (Walters). The Archives will be 150,000 square feet, a fraction of the size of the hypothetical building proposed for 634 Reily Street. Vol. III, Tr. 30:16-24 (Heiland).

d. PSERS acquired the Patriot News building in downtown, close to its existing facility, and demolished the structure. Some three years after this acquisition, there has been no announcement of any planned building on the property. Vol. III, Tr. 31:18-22, 32:16-20 (Heiland); *see also* Vol. II, Tr. 170:22-23 (Walters) ("I don't think PSERS would have gone over to where the subject property is.").

188. Further, an existing institution in the midtown neighborhood, Harrisburg Area Community College, is downsizing its footprint in the neighborhood. Vol. III, Tr. 33:20-34:2

---

[21] The transaction was announced after the Date of Value. Ex. P-21 (Heiland Rep.) at US-MVG-0003814.

(Heiland).

*The Financial Feasibility of a 357,000+ Square Foot Building*

189.    In order to maximize size, Mr. Snyder's conceptual plan for an office building on the 634 Reily Street parcel contemplates six levels of parking, with four levels located entirely below grade.  Ex. D-11 (Snyder Conceptual Site Plan); Vol. I, Tr. 110:11-13 (Snyder).

190.    Parking in the City of Harrisburg typically is above grade.  Vol. II, Tr. 120:6-8 (Walters).  Just four buildings in the entire City offer as many as two to three levels of underground parking.  Vol. I, Tr. 90:10-91:2 (Brinjac).  In the immediate neighborhood, PHEAA has a 1,200-space, above-ground parking garage, and "there was never any thought to go below grade" due to cost.  *Id.*, Tr. 69:15-70:2.

191.    No building in the City of Harrisburg has four levels of underground parking.  Vol. I, Tr. 89:23-90:7 (Brinjac); Vol. I, Tr. 128:23-129:1 (Snyder).  Four levels of below-grade parking may require blasting of bedrock and dewatering (where the proposed parking facility is beneath the water table).  Vol. I, Tr. 129:8-17 (Snyder) (admitting that he did not review geotechnical studies and did not know where bedrock and the water table are located), 130:19-131:18.  Mr. Snyder did not analyze the maximum size building that could be constructed at 634 Reily Street by right with one or two levels of underground parking.[22]  *Id.*, Tr. 132:15-22.

192.    Mr. Snyder did not undertake any analysis to determine the extent of blasting and dewatering and the expected cost and feasibility of such work.  Vol. I, Tr. 129:8-17, 131:3-18 (Snyder).

---

[22] Keeping the building footprint the same as in Mr. Snyder's conceptual site plan, but only providing for two levels of above ground parking and one level of below ground parking, would support a 178,500 square foot building given the parking requirements.  Vol. I, Tr. 131:19-132:14 (Snyder).

193.    Indeed, Mr. Snyder did not put forward any estimate of the expected cost of constructing a 357,000+ square foot office building at 634 Reily Street.  Vol. I, Tr. 125:3-5. (Snyder).  Mr. Walters accordingly did not analyze the financial feasibility of constructing such a building.

194.    The evidence established that the proposed building likely would not be financially feasible.  Mr. Brinjac, an engineer whose company did the engineering work for two of the largest buildings in Harrisburg (PHEAA and the Commonwealth Keystone Building) (Vol. I, Tr. 81:2-4, 87:2-8 (Brinjac)) told Mr. Walters in 2016 that an office building on the 634 Reily Street property could be expected to cost $100 million.  Vol. II, Tr. 92:17-20 (Walters).

195.    Mr. Brinjac's back-of-the-envelope $100 million estimate did not consider four levels of underground parking.  Four levels of underground parking would increase the cost of construction.  Vol. I, Tr. 89:9-22 (Brinjac); Vol. I, Tr. 131:3-18 (Snyder).

196.    Mr. Walters agreed that, at some level, the proposed project could be cost prohibitive. Vol. II, Tr. 89:2-4.  Mr. Walters further agreed that a developer would not construct a $110 million building at prevailing market rents.  *Id.*, Tr. 93:4-23 (agreeing with his prior deposition testimony that "you wouldn't build a $110 million … building based on a market rent of $20 to $25 a square foot").[23]

## CONCLUSIONS OF LAW

*The Subject Properties Should Be Valued Separately*

197.    In determining the larger parcel, courts consider three factors: (1) unity of use, (2)

---

[23] Mr. Nalbandian's estimate of going rates for premier office space was lower—$20 to $21 per square foot.  Vol. III, Tr. 221:19-22 (Nalbandian).

unity of ownership, and (3) contiguity or proximity.  Ex. P-67 (Yellow Book) at § 4.3.4[24]; *see also United States v. 8.41 Acres of Land in Orange Cty.*, 680 F.2d 388, 393 (5th Cir. 1982).

198.    The three Subject Properties are not contiguous.  They were separated by public streets at the Date of Value.  Stip. Fact No. 17 (showing aerial photo of the Subject Properties).

199.    The Subject Properties did not share the same or an integrated highest and best use at the Date of Value and were not anticipated to do so in the reasonably near future.  Several facts establish that the Subject Properties are economically distinct parcels including:

- RSA did not list all three of the Subject Properties for sale when it twice attempted to sell 634 Reily Street;

- 644 Boyd Street and 1519 North Sixth Street were never used as part of the parking operation at 634 Reily Street;

- Mr. Snyder's conceptual site plan for development of a 357,000 square foot office building does not include 644 Boyd Street or 1519 North Sixth Street because of those parcels' small size and disconnection from 634 Reily Street; and

- RSA acquired 644 Boyd Street and 1519 North Sixth Street to protect its investment in 634 Reily Street—not to use the properties together.

*See supra* at ¶¶ 14, 15, 30, 51.

200.    Mr. Walters testified that a buyer of 634 Reily Street could have used 644 Boyd Street and 1519 North Sixth Street as a construction lay down area.  Vol. II, Tr. 166:12-14 (Walters). But that would be a temporary use related to construction only, disconnected from the property's supposed highest and best use as an office building.  Indeed, Mr. Walters agreed that the

---

[24] Mr. Walters agreed that he would apply § 4.3.4 of the Yellow Book to determine the larger parcel.  Vol. II, Tr. 164:24-165:13 (Walters).

properties would be "spun off" after construction.  *Id.*, Tr. 166:18-21.  Mr. Walters testified that "those parcels would be used in the interim and potentially estopped to an abutting property owner or used in connection with the development and then estopped to somebody else," but that those two parcels "don't really add a great deal to the primary block of property, which is the Reily Street parking lot."  Vol. I, Tr. 182:4-9 (Walters).

201.    The Court finds that the Subject Properties should be valued separately, as three distinct tracts.

*Legal Standard for Just Compensation*

202.    Just compensation is the property's market value on the date of the taking, which reflects "the value of the highest and best use for which the property is adaptable in the reasonably near future from the vantage point of the date of taking."  *United States v. 68.94 Acres of Land, More or Less, Situate in Kent Cty., State of Del.*, 918 F.2d 389, 393 (3d Cir. 1990).  In order to determine the highest and best use, an appraiser must determine whether the use is (1) physically possible; (2) legally permissible; (3) financially feasible; and (4) maximally productive.  *United States v. 1.604 Acres of Land, More or Less, Situate in City of Norfolk, Va.*, 844 F. Supp. 2d 668, 679 (E.D. Va. 2011).

203.    RSA had the burden of proving the market value of 634 Reily Street at the Date of Taking.  *United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 273 (1943) ("The burden of establishing the value of the lands sought to be condemned was on [landowner].") (citations omitted).  RSA therefore needed to establish by a preponderance of the evidence that its proposed 357,000+ square foot office building was reasonably probable in the reasonably near future at the Date of Value.  *See, e.g., Olson v. United States*, 292 U.S. 246, 257 (1934) ("Elements affecting value that depend upon events or combinations of occurrences, which,

while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for ascertainment of value . . ."); *id.* at 255 (highest and best use is the "use for which the property is adaptable and needed or likely to be needed in the reasonably near future").

*RSA Failed to Carry Its Burden of Providing That 634 Reily Street Should Be Valued Based on a Hypothetical 357,000-400,000 Square Foot Office Building*

204. The Court finds that RSA did not present sufficient evidence to overcome the presumption that the property's existing use was its highest and best use. The Court finds that RSA's proposed 357,000+ square foot office building was not credible, speculative, and not reasonably probable on the Date of Value. The evidence at trial established that RSA took no steps to develop 634 Reily Street, and its actual use was as a parking lot; RSA failed to establish market demand for such the proposed 357,000+ square foot office building, nor offered plausible evidence of demand for such a space from so-called institutional investors; and last, RSA failed to show that such an office building would have been financially feasible.

### RSA Took No Steps to Develop 634 Reily Street

205. The law presumes that a property's actual use at the Date of Taking is its highest and best use because owners typically seek to maximize their return. *See, e.g., United States ex rel. Tennessee Valley Authority v. 1.72 Acres of Land*, 821 F.3d 742, 753 (6th Cir. 2016) (internal citations omitted) ("[t]he property's current use is presumed to be its highest and best use"); *United States v. Buhler*, 305 F.2d 319, 328-29 (5th Cir. 1962) (explaining that "economic demands normally result in an owner's putting his land to the most advantageous use" and therefore the existing use at the date of taking is "compelling evidence" of the highest and best use).

206.     RSA had more than 25 years to develop 634 Reily Street but did nothing other than prepare some "rough sketches" in the mid-1990s.  RSA did not obtain approvals for development, did not prepare business plans, did not have any engineering done, and did not obtain financing.  *See supra* at ¶¶ 23-27.

207.     RSA did not put forward any evidence that it was approached, at any time, by a buyer or developer who wanted to develop any of the Subject Properties with an office building or any other structure.  To the contrary, RSA twice listed 634 Reily Street for sale but received no expressions of interest, let alone written offers.  *See supra* at ¶¶ 28-29.

208.     A proposed use is speculative, not reasonably probable, where, as here, no steps have been taken to advance the proposed land use and no party ever has expressed interest in so developing the property.  *See, e.g., United States v. 99.66 Acres of Land*, 970 F.2d 651, 655-56 (9th Cir. 1992) (affirming exclusion of landowner's evidence that vacant land should be valued as if subdivided where landowner had done nothing to advance a subdivision except for some engineering plans and drainage work); *United States v. 400 Acres*, No. 2:15-cv-1743-MMD-NJK, 2020 WL 5074255, at *19-20 (D. Nev. Aug. 27, 2020) (rejecting valuation based on a proposed tourism use because, among other reasons, landowners did not pursue tourism prior to the taking and "no one approached [l]andowners about buying the property for a potential tourism use").

### RSA Failed to Establish Demand For a 357,000+ Office Building

209.     A party seeking to value a property based on a hypothetical use must establish market demand for such use.  *See, e.g.*, *Olson*, 292 U.S. at 255 (property must be "adaptable and needed or likely to be needed in the reasonably near future" for the proposed use); *United States v. 62.50 Acres of Land*, 953 F.2d 886, 890 (5th Cir. 1992) (internal citations omitted) (explaining that a

landowner can overcome the presumption that the existing use is the highest and best use "only by showing a reasonable probability that the land is adaptable and needed for the potential use in the near future"); *Buhler*, 305 F.2d at 326 (explaining that "it would be pure speculation" to hold that a proposed use is the highest and best use "in the absence of any evidence of demand"); *400 Acres of Land*, 2020 WL 5074255, at *5 (finding that landowners' proposed highest and best use had to be rejected as speculative because landowners failed to establish demand with market evidence); *see also* Ex. P-67 (Yellow Book) at § 4.3.2.2 ("Any highest and best use requires a showing of <u>market demand</u>.... To meet this standard, objective evidence substantiating the appraiser's market demand analysis is required. Value implies demand and a buyer—and each must be proven, never assumed.") (emphasis in original; internal punctuation omitted).

210.    RSA did not establish that there was demand for a new, 357,000+ square foot office building at the Date of Value, which, if constructed, would be among the largest structures in all of Harrisburg. Mr. Walters did not perform a demand analysis as part of his appraisal. Vol. II, Tr. 95:23-96:2 (Walters). He did not analyze the supply of existing office space, nor conduct a market study. *Id.*, Tr. 96:3-14. He did not determine when such a building ever could or would be constructed. *Id.*, Tr. 105:12-17.

211.    Instead, Mr. Walters testified that market reports would not reflect the need for large scale institutional uses because those types of institutions "have their own growth projections, and they have internal information that they don't share with the public" and "when they have a demand or a need that they believe is necessary for their ongoing growth, they make a decision." Vol. II, Tr. 15:15-23.

212.    Moreover, RSA did not put forward any evidence of demand aside from some anecdotes about institutional buyers acquiring land for office space. *See supra* at ¶¶ 182-187.

These anecdotes, if anything, demonstrate the absence of demand.

213.    Mr. Walters aptly described institutional buyers as "unicorns" in his prior deposition testimony.  Vol. II, Tr. 105:4-7; *see supra* at ¶ 186.

214.    The evidence established the absence of demand for a new 357,000+ square foot office building at the Date of Taking.  *See supra* at ¶¶ 55-60, 171-188.  The evidence includes, by way of example:

- Landmark Market Watch report reported negative absorption of office space in the City of Harrisburg for 2017, the year preceding the Date of Value.  Ex. P-14; *see supra* at ¶ 172.

- The newest office building in midtown Harrisburg, Campus Square, was completed in late 2009 or 2010, close to a decade prior to the Date of Value.  The 75,000 square foot building had 40,000-50,000 square feet of space available for lease at the Date of Value.  Vol. III, Tr. 27:2-11 (Heiland); *see supra* at ¶ 179.

- Office space is being eliminated, not built, near the Subject Properties.  After its 2014 purchase, PHEAA demolished the 129,000 square foot Bertolino Office building for parking.  *See supra* at ¶¶ 89, 180.

- None of Mr. Walters's 11 comparable properties sold for new office space (although retail and office space later were constructed on Mr. Walters's Sale 8 property).  *See supra* at ¶¶ 60, 85-107.

- RSA received no interest when it listed 634 Reily Street for sale.  *See supra* at ¶¶ 28-29.

215.    Accordingly, the Court finds that RSA has not carried its burden of establishing market demand for a 357,000+ square foot office building.

*RSA Failed to Establish Financial Feasibility*

216.    A proposed use that is not financially feasible cannot be the highest and best use and cannot be the foundation of value.  RSA put forward no evidence regarding the actual cost of its proposed office building and whether the proposed structure would be financially feasible.  *See*, *e.g.*, Vol. I, Tr. 125:3-5 (Snyder) (no analysis of cost); Vol. II, Tr. 88:18-89:4 (Walters) (agreeing that there is no cost estimate and that the building could be cost prohibitive).  Instead, Mr. Walters testified that the financial feasibility analysis for an institutional investor or owner/occupant is not the same compared to a developer, because institutions have "their own growth projections," which "they don't share with the public," and when they identify a need to grow, "they make a decision."  Vol. II, Tr. 16:1-5.  RSA appears to contend that an institutional buyer, because it would occupy the entire space, would not care about cost.  RSA introduced no evidence in support of this theory, which cannot be correct and is not convincing to the Court.  Institutions have budgets and do not proceed oblivious of cost and would likely consider office rents in a market when determining whether to lease, purchase, or build a space.  *See*, *e.g.*, Vol. III, Tr. 28:16-19 (Heiland).

217.    This is no small or inconsequential omission:  RSA's proposed building would require four levels of underground parking (no other building in the City has four levels of underground parking) and likely would cost well in excess of $100 million to construct (as Mr. Brinjac's $100 million, back-of-the-envelope estimate did not anticipate four levels of underground parking).  *See supra* at ¶¶ 189-196.

218.    RSA's failure to establish the financial feasibility of its proposed 357,000+ square foot office building renders the use speculative, not reasonably probable.  *See 1.72 Acres of Land*, 821 F.3d at 750 (affirming exclusion of expert testimony where expert had not provided any analysis as to whether the proposed hotel development was feasible); *400 Acres of Land*,

2020 WL 5074255, at *18 (paragraph 67) (refusing to consider alternative proposed highest and best use where landowners did not put forward any evidence of financial feasibility); *United States v. An Easement & Right-of-Way Over 3.74 Acres of Land*, 415 F. Supp. 3d 812, 824 (M.D. Tenn. 2019) (excluding proposed use for failure to prove market support and financial feasibility) ("Parrish has not shown that he is actually in possession of facts or data that would be necessary to support his conclusion that developing the Subject Property is either financially feasible or the maximally productive use for the land.").

*RSA's Valuation Based on Mr. Walters's Calculation of Price Per Square Foot of Buildable Area Is Unreliable*

219.    RSA otherwise did not carry its burden of proving the fair market value of the Subject Properties based on a hypothetical 357,000+ square foot office building.  Mr. Walters developed a price per square foot of building area based on three supposedly comparable sales and then multiplied this price by the maximally sized office building that could be built, by-right, on the 634 Reily Street parcel.  This methodology runs contrary to market behavior.  In addition, in calculating his unit rate, Mr. Walters failed to make an apples-to-apples comparison rendering it unreliable.

220.    Mr. Walters's valuation based on price per buildable area accordingly is flawed, not credible and deserves no weight.  Fed. R. Evid. 702 (expert testimony must be "based on sufficient facts or data" and be the "product of reliable principles and methods").

<u>Mr. Walters's Methodology Does Not Track Market Behavior</u>

221.    An appraiser should select a unit of comparison that tracks market behavior when valuing property based on the sales comparison approach.  *See supra* at ¶¶ 62-63.  Mr. Walters failed to do this in selecting price per square foot of buildable area as his unit of comparison.

222.    The market for new office space in the City of Harrisburg is not sufficiently dynamic to employ price per square foot of buildable area as the unit of comparison for purchases of land/parking lots.  For <u>none</u> of the myriad properties discussed at trial did the buyer construct the maximally sized, by-right structure.  *See supra* at ¶¶ 66-67.

223.    The listing of the 634 Reily Street property confirms that market participants do not trade properties based on the hypothetical, maximally sized building that could be constructed. Jim Helsel, the listing agent, developed a listing price based on a price per square foot of <u>land</u>, not buildable area.  *See supra* at ¶ 68.

224.    In few, if any, cases could market participants ever value land in the City of Harrisburg based on a price per square foot of buildable area.  Mr. Walters confirmed that such an approach requires reliable engineering plans to show the maximum by-right structure that could be built.  But such information is not available in this market.  The 634 Reily Street parcel lacked such engineering plans at the Date of Value, and, with one notable exception, no such plans were available for any of the different comparable sales identified by Mr. Walters and Mr. Heiland.[25]  *See supra* at ¶¶ 69, 72.

### *Mr. Walters's Valuation Is Unreliable Because He Failed to Make an Apples-to-Apples Comparison*

225.    Mr. Walters testified that buyers and sellers determine a selling price based on the maximally sized, by-right building that can be constructed on a property.  Mr. Walters accordingly valued the Subject Properties based on the maximally sized, by-right office building

---

[25] The exception is Walters Sale 8, which sold with approvals in place for a 14-story hotel.  Ex. P-69.  Mr. Walters did not know that the City had approved this 14-story hotel notwithstanding his familiarity with the Harrisburg market.  *See supra* note 5.  This underscores the difficulty, if not impossibility, of valuing properties based on a price per square foot of buildable area.

that could be constructed on it: 357,000 square feet. For an apples-to-apples comparison, Mr. Walters needed to determine the maximally sized, by-right structure that could be built on each of his comparable sales. *See supra* at ¶¶ 70-71.

226.    Mr. Walters failed to make this determination. He did not know the maximally sized, by-right structure that could be built on any of his three comparable sales, and the evidence established that materially larger structures had been planned for each of these properties. *See supra* at ¶ 72.

### *Mr. Walters's Valuation Otherwise Is Unsupported and Unreliable*

227.    Mr. Walters's valuation based on a price per square foot of buildable area otherwise deserves no credit. The three sales (Walters Sales 1, 8, and 11) that Mr. Walters used to calculate a price per square foot are all vastly superior to 634 Reily Street. They do not compare to 634 Reily Street. *See supra* at ¶¶ 73-74. In addition, Sales 8 and 11 are dated sales. *See supra* note 9. If anything, those sales set a ceiling for Mr. Walters's valuation; they provide no basis for ascertaining a value conclusion.

228.    Further, no facts or data support Mr. Walters's final value conclusion of $10 per square foot of buildable area. This is the exact same unit rate Mr. Walters determined in his 2016 appraisal, when he did not have the benefit of Sale 1, which, according to him, sold at a unit rate of $8.23 per square foot of buildable area. The new Sale 1 data point, if anything, should have lowered Mr. Walters's valuation conclusion. *See supra* at ¶¶ 77-78. Nor do any facts or data support the 12% premium that Mr. Walters tacked on to his unit rate, for a final price of $11.20. *See supra* at ¶¶ 79-80.

*Mr. Walters's Check for Reasonableness Based on Price Per Acre Is Also Unreliable*

229.    As a check for reasonableness, Mr. Walters testified that the Subject Properties alternatively could be valued at $2 million/acre.  This would indicate a value of $3,530,000 for 634 Reily Street ($2 million x 1.765 acres = $3,530,000).  Mr. Walters arrived at $2 million/acre by (1) developing a price per acre unit rate for each of his 11 sales, (2) eliminating the two highest and the two lowest unit rates, and then (3) taking the average of the unit rates of the seven sales not eliminated.  Ex. D-15 (Walters Rep.) at pg. 52.

230.    This check for reasonableness valuation is unreliable because it relies on sales that are not comparable to 634 Reily Street, including: numerous sales that transacted more than a decade prior to the Date of Value, sales that are fraction of the size of 634 Reily Street, and sales in downtown Harrisburg or in midtown Harrisburg by the river.  *See United States v. 320.0 Acres of Land*, 605 F.2d 762, 798 (5th Cir. 1979) ("[C]omparability is largely a function of three variables: characteristics of the properties, their geographic proximity to one another, and the time differential.").  RSA did not even attempt to establish the comparability of a number of Mr. Walters's sales beyond identifying them as parking lots.  Vol. II, Tr. 27:20-28:12, 29:18-22 (Walters) (Sales 5, 6, 7, and 9 merely identified as parking lots); *see supra* at ¶¶ 93-99, 101-102 (discussing sales).

231.    Mr. Walters's methodology is not credible and unreliable in all events.  Properties that sold more than a decade prior to the Date of Value, that are a tiny fraction of the size of 634 Reily Street, and that are located in a superior neighborhood need to be adjusted to make them comparable—as Mr. Walters himself acknowledged.  Vol. II, Tr. 83:24-25 ("The rate per acre requires a lot of adjustments…."); *see also United States v. Eastman*, 528 F. Supp. 1184, 1186 (D. Or. 1981) ("Significant differences as to location, size, topography, market area, and recreational potential existed between most comparable sales and the subject property.  This

makes comparison extremely shaky because of the necessity of substantial adjustments required between the comparable and the subject."), *aff'd*, 714 F.2d 76, 77 (9th Cir. 1983).

232.    Mr. Walters claimed that he adjusted his sales to make them compare to the Subject Properties.  He did not.  Mr. Walters's "adjustments" are set forth in the table at page 50 of his report.  He adjusted his Sales 1, 2 and 3 upward to include demolition costs, but otherwise made no adjustment to any of his sales.  Ex. D-15 at pg. 50 (compare the row "$/Acre" with the row "Adjusted $/Acre").  To the extent he did do a qualitative analysis of the sales, he ignored it and simply averaged the unit prices.  *See supra* at ¶¶ 83-84.

233.    At bottom, Mr. Walters did not compare any of his properties to 634 Reily Street.  He did not account for differences between his comparable sales and 634 Reily Street.  He did not rank his sales.  Rather, he collected 11 sales, eliminated the two highest and two lowest unit rates (without any analysis to determine if the eliminated properties may have been comparable), and then averaged the remaining unit rates.  Mr. Walters did not perform a sales comparison valuation, let alone a reliable one.

*634 Reily Street's Best and Highest Use as of the Date of Taking Is for Parking*

234.    Due to RSA's failure to establish that an office building was the highest and best use of the 634 Reily Street parcel, as well as Mr. Walters's failure to provide a supported, reliable valuation based on the proposed office building, the property must be valued based on its actual, existing use at the Date of Value: as a parking lot.  *1.72 Acres of Land*, 821 F.3d at 753 ("The property's current use is presumed to be its highest and best use.") (citation omitted); *400 Acres of Land*, 2020 WL 5074255, at *32 (commission report adopted by court at paragraph 146) ("Landowners' failure to establish that large-scale tourism was the highest and best use … as well as [appraiser's] failure to support his valuation with comparable sales and supported

adjustments, mean that the [property] must be valued based on its actual, existing use at the Date of Value: as a rural recreational retreat.").

235. Finding no credible evidence to the contrary, the Court finds that the property's best and highest use is its existing use at the Date of Value, which is use as a parking lot.

### *Mr. Heiland Appropriately Valued the Property Using Different Approaches*

236. Mr. Heiland valued 634 Reily Street using the cost approach, sales comparison approach, and the income approach. *United States v. 47.14 Acres of Land*, 674 F.2d 722, 725-26 (8th Cir. 1982) (income approach may be appropriate in some instances, but "market value can be shown best by comparable sales").

237. Appraisers are required to disregard project influence in a federal eminent domain case. *See United States v. Reynolds*, 397 U.S. 14, 16-17 (1970). Mr. Heiland properly assumed that, but for the federal courthouse project, the City of Harrisburg would have zoned 634 Reily Street as Commercial General, not Institutional, in connection with its 2014 rezoning. *See supra* at ¶¶ 16-17, 19.

238. Mr. Heiland's zoning assumption is immaterial to this dispute in all events. The Commercial General and Institutional zoning designations both permit parking and office uses and, in general, the Commercial General designation permits more intensive development than does the Institutional designation. *See supra* at ¶¶ 20-21; Vol. III, Tr. 184:13-185:12 (Snyder) (somewhat larger building could be constructed in the Commercial General zone); Vol. IV, Tr. 6:12-14 (Walters) (Commercial General zone allows more flexibility for development).

### *Mr. Heiland's Cost Approach Valuation of 634 Reily Street Is Well-Supported*

239. The cost approach is appropriate to value property with existing physical

improvements. *See 1.604 Acres of Land*, 844 F. Supp. 2d at 682 (E.D. Va. 2011). In the cost approach, an appraiser determines contributory land value, as vacant, and adds the replacement cost of the improvements (less depreciation) to estimate market value. *Id.*

240. Mr. Heiland identified four comparable land sales to determine the contributory land value of 634 Reily Street, as vacant. *See supra* at ¶¶ 123-146. Mr. Heiland also estimated the replacement value of the parking lot site improvements at 634 Reily Street (less depreciation). *See supra* at ¶¶ 147-149. Together, the replacement cost of the improvements (less depreciation) and the contributory land value are a reliable indication of 634 Reily Street's market value for its highest and best use as a parking lot.

241. Mr. Heiland's determination that the contributory land value of 634 Reily Street, as vacant, is less than the value of 634 Reily Street as improved also supports his conclusion that the highest and best use of 634 Reily Street is for continued use as a parking lot. Vol. III, Tr. 34:12-35:6 (Heiland).

242. Mr. Heiland confirmed all four sales were arm's length, market-oriented transactions.[26] All four sales occurred within three years of the Date of Value. Three of the four sales are in the same neighborhood as 634 Reily Street—in midtown near the railroad tracks— and the fourth sale is in a similar location outside the downtown neighborhood. The properties ranged from 35,981 square feet to 82,766 square feet—similar to the size of 634 Reily Street at

---

[26] RSA questioned Mr. Heiland's conformance to Yellow Book standards for his evaluation of Land Sale 3, including for not reviewing the legislation that authorized and/or mandated the government's acquisition of the property, but Mr. Heiland explained that he felt this was not necessary because he had confirmed separately with the buyer and the seller that the transaction was market-oriented. Vol. III, Tr. 134:4135:2. Similarly, Mr. Heiland testified that he was unable to review the agency review of the appraisals because he did not believe one existed, and that he requested the entire file and reviewed what was provided. Vol. III, Tr. 135:16-136:8; *see also supra* at ¶¶ 138-139.

76,864 square feet.  *See supra* at ¶¶ 123-146.

243.   Market participants buy and sell land in Harrisburg on a price per square foot of land area.  *See supra* at ¶¶ 67-68.  Mr. Heiland's four comparable land sales ranged from $4.00 per square foot of land area to $18.60 per square foot of land area.  Ex. P-21 (Heiland Rep.) at US-MVG-0003884.

244.   Mr. Heiland properly concluded that 634 Reily Street should sell for less than Land Sale 1, a superior transaction/property, and more than Land Sales 2, 3, and 4, inferior properties. *See supra* at ¶¶ 123-129.  Mr. Heiland reasonably determined that 634 Reily, as vacant, should be valued at $15.40 per square foot.  Vol. III, Tr. 70:16-71:3 (Heiland).

245.   Mr. Heiland applied his $15.40 unit rate to the 76,864 square feet of land at 634 Reily Street.  This resulted in a total contributory land value of $1,183,706, rounded to $1,180,000. Ex. P-21 (Heiland Rep.) at US-MVG-0003884.  This sum, plus the contributory value of the parking lot improvements, as depreciated, resulted in a final value conclusion of $1,320,000.  *See supra* at ¶¶ 147-149.

246.   RSA did not present any alternative cost approach valuation of 634 Reily Street and did not challenge Mr. Heiland's calculation of the contributory value of the parking lot improvements.

### *Mr. Heiland's Sales Comparison Approach Valuation of 634 Reily Street Is Well-Supported and Reliable*

247.   The sales comparison approach is the preferred method of valuation under federal law. *320 Acres*, 605 F.2d at 798.  The comparability of sales is "largely a function of three variables: characteristics of the properties, their geographic proximities to one another, and the time differential."  *Id.*

248. Mr. Heiland identified four comparable parking lot sales to estimate the market value of 634 Reily Street as improved. These sales were all arm's length, market-oriented transactions, sold within five years of the Date of Value, and ranged from 40 parking spaces to 130 parking spaces. *See supra* at ¶¶ 150-164.

249. Market participants buy and sell parking lots in Harrisburg on a price per parking space basis. *See supra* at ¶ 151. Mr. Heiland reasonably determined, based on his comparable sales, that 634 Reily Street should be valued at $5,490 per parking space. This is the same unit rate as Mr. Heiland's Parking Lot Sale 1, the most comparable parking lot sale overall. *See supra* at ¶¶ 155, 165.

250. Mr. Heiland's unit rate of $5,490 per parking space establishes a market value $1,270,000 for 634 Reily Street. *See supra* at ¶ 166.

### *Mr. Heiland's Income Approach Is a Compelling and Well-Supported Test of Reasonableness*

251. Mr. Heiland also performed an income-approach valuation as a test of reasonableness. The income approach indicated a value of $1,350,000 for 634 Reily Street, corroborating the reasonableness of Mr. Heiland's cost and sales comparison approach valuations. *See supra* at ¶¶ 167-170.

252. RSA did not put forward an alternative income-approach valuation or alternative capitalization rate. RSA did not challenge any of the inputs utilized by Mr. Heiland in determining a value, other than questioning Mr. Heiland's capitalization rate. Specifically, Mr. Heiland was questioned about a four percent capitalization rate, but no testimony or other evidence was proffered in support of such a low rate. Vol. III, Tr. 167:3-5 (Heiland). Mr. Heiland testified that "[n]ever in a million years would I have used four percent." *Id*., Tr. 167:5.

*Mr. Heiland's Final Value Conclusion Is Supported*

253.   Mr. Heiland determined his final value of $1,300,000 for 634 Reily Street by assigning roughly equal weight to his cost approach valuation ($1,320,000) and his sales comparison approach valuation ($1,270,000).  Mr. Heiland appropriately assigned roughly equal weight to each valuation in his reconciliation.  *See supra* at ¶ 117.

Consistent with the above Findings and Conclusions, the Court hereby enters the following:

## **ORDER**

Judgment hereby is entered, in favor of Plaintiff and against Defendant. The Court finds, by a preponderance of the evidence, that the Subject Properties should be valued separately, not as one larger parcel. The Court further finds, by a preponderance of the evidence, that the 644 Boyd Street parcel had a value of $10,000 at the Date of Taking and the 1519 North Sixth Street parcel had a value of $20,000 at the Date of Taking. RSA failed to establish that the 634 Reily Street parcel should be valued based on a best and highest use of institutional development of a 357,000-400,000 square foot office building. The property accordingly must be valued based on the actual use to which RSA put the property for the years prior to the taking: as a parking lot. The Government presented a persuasive, supported analysis that 634 Reily Street had a fair market value of $1,300,000 at the Date of Value based on its use as a parking lot. Therefore, the Court finds, by a preponderance of the evidence, that just compensation for the taking of all three Subject Properties is $1,330,000.


IT IS SO ORDERED.


May 27, 2021                                        s/Cathy Bissoon_____
                                                   Cathy Bissoon
                                                   United States District Judge

cc (via ECF email notification):

All Counsel of Record